UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA


| | | |
|---|---|---|
| In re: | ) | Lead Case No. 1:03-CV-049 |
| | ) | |
| | ) | <u>CLASS ACTION</u> |
| UNUMPROVIDENT CORP. | ) | |
| SECURITIES LITIGATION | ) | MDL Case No. 1:03-MD-1552 |
| | ) | |
| | ) | Judge Curtis L. Collier |

_____

| | | |
|---|---|---|
| SILVIO AZZOLINI, on behalf of himself and | ) | |
| all others similarly situated, | ) | |
| | ) | Lead Case No. 1:03-CV-1003 |
| Plaintiff, | ) | |
| | ) | <u>CLASS ACTION</u> |
| V. | ) | |
| | ) | MDL Case No. 1:03-MD-1552 |
| CORTS TRUST II FOR PROVIDENT | ) | |
| FINANCIAL TRUST I, *et al.*, | ) | Judge Curtis L. Collier |
| | ) | |
| Defendants. | ) | |

_____

| | | |
|---|---|---|
| HARRIET BERNSTEIN, on behalf of herself | ) | |
| and all others similarly situated, | ) | |
| | ) | Case No. 1:03-CV-1005 |
| Plaintiff, | ) | |
| | ) | <u>CLASS ACTION</u> |
| V. | ) | |
| | ) | MDL Case No. 1:03-MD-1552 |
| CORTS TRUST FOR PROVIDENT | ) | |
| FINANCING TRUST I, *et al.*, | ) | Judge Curtis L. Collier |
| | ) | |
| Defendants. | ) | |

<u>**M E M O R A N D U M**</u>

TABLE OF CONTENTS

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.     RELEVANT FACTS AND PROCEDURE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

        A.      General Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        B.      The Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        C.      The Glickenhaus Allegations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        D.      The Azzolini and Berstein Allegations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

III.    STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

IV.     IN RE UNUMPROVIDENT CORP. SECURITIES LITIGATION (1:03-CV-49) . . . . 15

        A.      Request for Judicial Notice and Motion to Strike . . . . . . . . . . . . . . . . . . . . . 16
        B.      Statute of Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
        C.      Failure to State a Claim for Securities Fraud . . . . . . . . . . . . . . . . . . . . . . . . . 33
                1.      Material Misstatements and/or Omissions . . . . . . . . . . . . . . . . . . . . . . 34
                        a.      Alleged Claims Handling Misrepresentations . . . . . . . . . . . . . 35
                        b.      Alleged Investment Misrepresentations . . . . . . . . . . . . . . . . . . 44
                2.      Scienter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
                        a.      Alleged Claims Handling Misrepresentations . . . . . . . . . . . . . 49
                        b.      Alleged Investment Misrepresentations . . . . . . . . . . . . . . . . . . 53
                3.      Causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
                        a.      Alleged Claims Handling Misrepresentations . . . . . . . . . . . . . 58
                        b.      Alleged Investment Misrepresentations . . . . . . . . . . . . . . . . . . 61
        D.      Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

V.      THE AZZOLINI AND BERNSTEIN ACTIONS
        (1:03-CV-1003 & 1:03-CV-1005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

        A.      Scienter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
        B.      Causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
        C.      Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

VI.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

**I.      INTRODUCTION**

The Judicial Panel on Multidistrict Litigation ("JPML") has assigned to this Court a number of putative class action lawsuits against Defendant UnumProvident Corporation ("UnumProvident") and various of its directors, officers, and employees. For purposes of efficient case management, the Court consolidated several of these cases and then grouped the cases into two broad categories by subject matter. The first such category is comprised of a number of putative class actions alleging improper denial of disability insurance benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), and applicable state law (collectively "Coordinated Benefits Actions"). The second category includes various putative securities fraud class action lawsuits brought on behalf of purchasers of UnumProvident securities and UnumProvident-related securities, two consolidated putative class actions brought on behalf of UnumProvident employees participating in the company's 401(k) plan and alleging violations of various fiduciary duties under ERISA, and a consolidated shareholder derivative action asserting claims on behalf of UnumProvident against certain of its officers and directors (collectively "Securities Related Actions").

The instant Memorandum and accompanying Order address motions to dismiss filed in the putative securities fraud class actions by Defendant UnumProvident and Defendants Thomas R. Watjen, Robert C. Greving, Ralph W. Mohney, Jr., and J. Harold Chandler, all of whom are current or former UnumProvident directors or executives (collectively, "Defendants").[1] Each of these

---

[1] The Court notes the group of entities and persons listed in the preceding sentence does not comprise the entire panoply of defendants named in the above-captioned actions. Specifically, the *Azzolini* and *Bernstein* actions include claims against a number of additional defendants whom the Court will refer to in this memorandum as "the SSB Defendants" (*see infra* at 4). However, because the instant Memorandum and Order addresses only those motions to dismiss filed by UnumProvident and persons currently or formerly affiliated with that company, the Court will use the general shorthand "Defendants" to refer to these parties.

defendants has moved the Court to dismiss all of the securities fraud claims asserted against them in the instant putative class action lawsuits (Case No. 1:03-CV-49, Court File Nos. 107, 108; Case No. 1:03-CV-1003, Court File Nos. 13, 14; Case No. 1:03-CV-1005, Court File Nos. 23, 25). Because these three actions rely on a common basis of underlying factual allegations and because the UnumProvident Defendants have raised common arguments in support of dismissal of all three complaints, the Court will consolidate its ruling on each of the various motions to dismiss into a single Memorandum.

## II.     RELEVANT FACTS & PROCEDURE

### A.     General Background

UnumProvident, a Delaware corporation with its principal place of business in Chattanooga, Tennessee, is the parent company of a number of insurance companies operating throughout the United States and abroad. Through its subsidiaries, the company provides a wide range of group and individual insurance products including disability insurance, life insurance, long-term care insurance, and payroll-deducted voluntary benefits plans offered by employers to their employees. UnumProvident is a publicly-held corporation which periodically offers a variety of different types of securities for sale to the investing public.

At some point in early 2001, Defendant Structured Products Corporation ("SPC") established two New York trusts, Defendants CorTS Trust for Provident Financial Trust I ("CorTS Trust I") and CorTS Trust II for Provident Financial Trust I ("CorTS Trust II"), for the purpose of disseminating corporate-backed trust securities ("CorTS") backed by UnumProvident securities. SPC is a Delaware corporation and wholly owned subsidiary of Defendant Salomon Smith Barney Holdings,

4

Inc. ("SSB Holdings") which in turn is a holding company apparently created by Defendant Salomon Smith Barney, Inc., an international brokerage and investment banking firm with its principal place of business located in New York, New York. None of these entities are affiliated with UnumProvident or any of the individual UnumProvident Defendants. Within the context of this Memorandum, SSB, SSB Holdings, SPC, CorTS Trust I, and CorTS Trust II are collectively referred to as "the SSB Defendants." Through initial public offerings on or about January 31, 2001, and on or about April 18, 2001, CorTS Trust I and CorTS Trust II certificates were issued and sold to investors. Both trusts' assets consisted entirely of securities issued in 1998 by a UnumProvident affiliate (Provident Financing Trust I), whose sole assets were in turn debentures issued directly by UnumProvident.

## B. The Litigation

In late 2002 and early 2003, certain negative information about UnumProvident's accounting and business practices began to circulate in the public arena, the company's financial results took a turn for the worse, and the value of many of its securities dropped rather precipitously. On February 12, 2003, Frank W. Knisley filed a putative securities fraud class action lawsuit in this Court on behalf of all purchasers of UnumProvident securities (Case No. 1:03-CV-49, Court File No. 1). Four virtually identical lawsuits were filed in this Court in the months and weeks that followed and, on May 21, 2003, the Court consolidated the *Knisley* action with those suits and renamed the consolidated action *In re UnumProvident Corp. Securities Litigation* (Case No. 1:03-CV-49, Court File No. 50).[2] Meanwhile, on May 8, 2003, Silvio Azzolini filed a putative securities

_____

[2]The consolidated cases were: *Knisley v. UnumProvident Corp., et al.*, No. 1:03-CV-49; *Rasner v. UnumProvident Corp., et al.*, No. 1:03-CV-54; *Elias v. UnumProvident Corp., et al.*, No. 1:03-CV-81; *Stolz v. UnumProvident Corp., et al.*, No. 1:03-CV-84; and *Miller v. UnumProvident*

fraud class action lawsuit of his own in the United States District Court for the Southern District of New York on behalf of persons who had purchased the CorTS Trust II certificates (Case No. 1:03-CV-1003, Court File No. 1, Doc. No. 1),[3] and, on July 7, 2003, Harriet Bernstein filed a similar lawsuit in the United States District Court for the Eastern District of New York on behalf of purchasers of the CorTS Trust I certificates (Case No. 1:03-CV-1005, Court File No. 1, Doc. No. 1).[4] Pursuant to an order entered on October 6, 2003, the JPML transferred these and a number of other putative securities fraud actions to this Court for coordinated and/or consolidated pretrial proceedings.

Following the conclusion of proceedings before the JPML, various entities filed competing motions pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") 15 U.S.C. § 78u-4 *et seq.*, seeking to be named lead plaintiff in the consolidated *In re UnumProvident Corp. Securities Litigation*. On November 6, 2003, the Court selected Glickenhaus & Company (hereinafter "Glickenhaus") for this role and approved its selection of lead counsel (Case No. 1:03-CV-49, Court File Nos. 76, 77). The Court later consolidated a sixth putative securities fraud class action, *Martin v. UnumProvident Corp., et al.*, Case No. 1:03-CV-162, which had originally been filed in the Southern District of New York but was transferred to this Court prior to the conclusion of the proceedings before the JPML (*see* Case No. 1:03-MD-1552, Court File No. 34). Additionally, the Court consolidated the *Azzolini* action with two other putative securities fraud class actions

---

*Corp., et al.*, No. 1:03-CV-119.

[3]Hereinafter, all citations to the record in the *Azzolini* action shall appear as "*Azzolini* Court File No. _".

[4]Hereinafter, all citations to the record in the *Bernstein* action shall appear as "*Bernstein* Court File No. _".

brought by purchasers of CorTS Trust II certificates,[5] but elected not to consolidate those actions

with either the *Bernstein* action or the six actions consolidated into *In re UnumProvident Corp.*

*Securities Litigation* (*see Azzolini* Court File Nos. 9, 10). Glickenhaus filed a "Consolidated

Complaint for Violation of the Federal Securities Laws" on January 9, 2004 (Case No. 1:03-CV-49,

Court File No. 83, hereinafter "Glickenhaus Complaint"), and, on March 19, 2004, the *Azzolini*

plaintiffs filed a consolidated amended complaint (*Azzolini* Court File No. 11, hereinafter "*Azzolini*

Complaint") and Bernstein filed an amended complaint (*Bernstein* Court File No. 18, hereinafter

"*Bernstein* Complaint").

## C.     The Glickenhaus Allegations

Glickenhaus seeks to represent itself and a putative class of "all persons who [] purchased

any UnumProvident publicly-traded securities on the open market during the period March 30, 2000

through April 24, 2003 (the "Class Period")" excluding all "directors and officers of UnumProvident

and their families and affiliates" (Glickenhaus Complaint at ¶ 229). The Glickenhaus Complaint

asserts causes of action against the UnumProvident Defendants for violations of (1) § 10(b) of the

Securities Exchange Act of 1934 ("1934 Act") and Rule 10b-5 promulgated thereunder (*id.* at ¶¶

235-39), and (2) § 20(a) of the 1934 Act (*id.* at ¶¶ 240-41). The Glickenhaus Complaint is 149

pages in length and contains 241 numbered paragraphs. It is organized and structured topically as

follows: Nature of the Action (¶¶ 1-10); Jurisdiction and Venue (¶¶ 11-12); The Parties (¶¶ 13-23);

Background to the Fraudulent Scheme (¶¶ 24-33); Defendants' Illegal Manipulation of Reserves by

Denying and Terminating Legitimate Claims (¶¶ 34-66); The Truth Comes to Light (¶¶ 67-72);

---

[5]The consolidated cases were *Finke v. CorTS Trust II for Provident Financing Trust I, et al.*, No. 1:03-CV-1006, and *Strahle v. CorTS Trust II for Provident Financing Trust I, et al.*, No. 1:03-CV-1007.

Additional Facts Supporting a Strong Inference of Scienter (¶¶ 73-88); UnumProvident's False Financial Reporting During the Class Period (¶¶ 89-92); UnumProvident Failed to Provide Adequate Claims Reserves (¶¶ 93-101); UnumProvident Failed to Provide Full and Adequate Disclosures Concerning its Claims Manipulations (¶¶ 102-04); UnumProvident Failed to Properly Account for the Non-Temporary Impairment of its Investments (¶¶ 105-18); UnumProvident Made Misleading Statements Regarding its Investments (¶¶ 119-26); UnumProvident's Restatement is an Admission of Falsity (¶¶ 127-30); False and Misleading Statements During the Class Period (¶¶ 131-228); Plaintiff's Class Action Allegations (¶¶ 229-34); First Claim for Relief (¶¶ 235-39); Second Claim for Relief (¶¶ 240-41); Prayer; and Jury Demand.

According to the Glickenhaus Complaint, the Defendants participated in a fraudulent scheme to manipulate UnumProvident's financial results by improperly denying or terminating disability claims. Glickenhaus alleges the Defendants did this for the purposes of permitting the company to consistently meet earnings projections, enabling the company to maintain its high debt and bond ratings and raise "desperately needed capital," maintaining the company's high rating and competitiveness in the disability and life insurance markets from which it derived the vast majority of its revenue, and personally enriching themselves (*see* Glickenhaus Complaint at ¶ 1). The Glickenhaus Complaint generally alleges the Defendants were under great pressure from analysts and shareholders to resuscitate the company and its stock price following three straight quarters of unexpectedly disappointing results in the wake of the June 30, 1999, merger of Unum and Provident (*id.* at ¶¶ 2-7, 24-33, 73-76). Glickenhaus claims that as a result of this pressure Defendants set upon a course of disseminating "highly positive but false statements" about the company's financial condition and future plans for growth while at the same time engaging in a scheme to deny and

terminate legitimate but expensive disability insurance claims in order to free up claims reserves (*id.* at ¶¶ 7-8). Glickenhaus claims this scheme had been originally developed by Provident executives in or about 1995 and was implemented company-wide following the merger with Unum (*id.* at ¶ 38-56). According to the Glickenhaus Complaint, Defendants implemented claims procedures specifically designed to produce as many claim "terminations" or "resolutions" (*i.e.*, denials) as possible by, in part, direct targeting of specific individual claims or classes of claims for denial, undocumented "roundtable meetings" of senior executives, the creation of "hit lists" of potentially expensive claims, the setting of denial target objectives, withholding benefit information from claimants, and using biased physician examiners (*id.* at ¶¶ 38-66). In addition, the Glickenhaus Complaint alleges Defendants improperly accounted for losses to the company's below-investment-grade (*i.e.*, "junk") securities (*id.* at ¶¶ 9, 68-69, 105-18).

In the "False and Misleading Statements During the Class Period" section of its consolidated complaint, Glickenhaus cites and quotes a number of statements made by Defendants in SEC filings, offering materials, annual reports to shareholders, press releases, media interviews, and presentations (*id.* at ¶¶ 131, 133, 135, 138, 141, 144-45, 147, 150-51, 156, 158, 161-64, 166-67, 171, 175-77, 179, 181-82, 185, 189-90, 192-94, 196-98, 200-03, 205, 209, 212, 214, 217, 220). The Glickenhaus Complaint lists these statements in chronological order interspersed with allegations regarding fluctuations in UnumProvident's stock price (*id.* at ¶¶ 132, 134, 136, 173, 213) and quotes from a host of analyst reports (*id.* at ¶¶ 137-40, 142, 146-48, 152-54, 156-57, 159-60, 163–64, 168-70, 172, 175-77, 180, 182-83, 186-88, 190, 194, 200-01, 206-08, 210, 215-16, 218, 220). Glickenhaus does not contemporaneously explain why each particular statement is false or misleading, but instead organizes allegations regarding statements, analyst reports, and stock prices

into groups and then, in a separate paragraph, alleges why each group of statements was false or misleading (*id.* at ¶¶ 134, 143, 149, 155, 165, 174, 178, 184, 191, 195, 199, 204, 211, 219, 221). All fifteen of these falsity allegation paragraphs are composed of four subparagraphs numbered (a) through (d). Each subparagraph alleges the falsity of the preceding statements with respect to a particular class of information (*e.g.*, claims of turning the company around by legitimate means, representations regarding reserves and claims handling practices, representations regarding investments and net income, and financial statements). Other than some variations in the language and examples employed in subparagraph (a), the fifteen falsity allegation sections are substantially identical.

Glickenhaus further alleges that in March and April 2003, after Defendants' activities had begun to come to light through individual lawsuits, state regulatory investigations, media reports, and an inquiry by the Securities and Exchange Commission ("SEC"), UnumProvident restated certain of its financial information for the fiscal years 2000 through 2002 (*id.* at ¶¶ 67-71). Glickenhaus alleges Defendants' activities caused the company's financial statements to understate expenses and liabilities and overstate income, caused the company's securities to trade at artificially inflated levels, and enabled the company to issue and sell billions of dollars worth of debt and securities to an investing public that would have had little interest had the truth of the company's financial condition been known (*id.* at ¶¶ 10, 72, 83, 89-101).

D.     **The *Azzolini* and *Bernstein* Allegations**

The *Azzolini* plaintiffs seek to represent themselves and a putative class of "all persons who purchased the Unum-Backed Certificates during the Class Period (March 21, 2001 – March 24, 2003) and who were damaged thereby" (*Azzolini* Complaint at ¶ 196) asserting, *inter alia*, causes

10

of action against Defendants UnumProvident, Chandler, and Greving under § 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder (*id.* at ¶¶ 205-16) and against Defendants Chandler and Greving under § 20(a) of the 1934 Act (*id.* at ¶¶ 217-20).[6] and (3) The *Azzolni* Complaint is 84 pages in length and contains 237 numbered paragraphs.  It is organized and structured topically as follows: Nature of the Action (¶¶ 1-13); Jurisdiction and Venue (¶¶ 14-16); Parties (¶¶ 17-27); Substantive Allegations (¶¶ 28-43); UnumProvident's Misconduct (¶¶ 44-89); False and Misleading Statements During the Class Period (¶¶ 90-125); The Truth Emerges (¶¶ 126-43); UnumProvident Defendants' Scienter (¶¶ 144-60); Material Misrepresentations and Omissions in the CorTS II Prospectus (¶¶ 161-95); Class Action Allegations (¶¶ 196-201); Applicability of Presumption of Reliance: Fraud-on-the-Market Doctrine (¶¶ 202-03); No Safe Harbor (¶ 204); First Claim for Relief (¶¶ 205-16); Second Claim for Relief (¶¶ 217-20); Third Claim for Relief (¶¶ 221-36); and Prayer for Relief (¶ 237).

Bernstein seeks to represent herself and a putative class "consisting of all those who purchased or otherwise acquired CorTS Certificates pursuant or traceable to an initial public offering on or about January 31, 2001 through March 24, 2003, inclusive (the 'Class Period') and who were damaged thereby" (*Bernstein* Complaint at ¶ 34) asserting, *inter alia*, causes of action against Defendants UnumProvident, Chandler, and Greving under § 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder (*id.* at ¶¶ 205-15) and against Defendants Chandler and Greving under §

---

[6]The *Azzolini* Complaint additionally asserts claims against Defendants SSB, SPC, and CorTS Trust II under §§ 11 and 15 of the Securities Act of 1933 ("1933 Act") (*Azzolini* Complaint at ¶¶ 221-36).  These defendants have filed a separate motion to dismiss this claim and the Court will address that motion in a later Memorandum and Order.

20(a) of the 1934 Act (*id.* at ¶¶ 216-19).[7] The *Bernstein* Complaint is 89 pages in length and contains 219 numbered paragraphs. It is organized and structured topically as follows: Nature of the Action (¶¶ 1-15); Jurisdiction and Venue (¶¶ 16-19); Parties (¶¶ 20-33); Plaintiff's Class Action Allegations (¶¶ 34-39); Substantive Allegations: The CorTS I IPO (¶¶ 40-51); Substantive Allegations: UnumProvident's Fraud (¶¶ 52-139); Substantive Allegations: Scienter Allegations with Respect to Defendant UnumProvident (¶¶ 140-57); Substantive Allegations: Violations by SSB and SPC (¶¶ 158-89); Count I (¶¶ 190-96); Count II (¶¶ 197-201); Count III (¶¶ 202-04); Count IV (¶¶ 205-15); Count V (¶¶ 216-19); and Jury Trial Demanded.

The *Azzolini* and *Bernstein* complaints contain largely identical allegations Defendants "issued and/or failed to correct false and misleading public statements and filings concerning the Company's financial performance during the Class Period" (*Azzolini* Complaint at ¶ 2; *Bernstein* Complaint at ¶ 2), specifically by "fail[ing] to disclose that the [company's] allegedly positive performance was the result of a pervasive and fraudulent scheme to deny and terminate expensive disability insurance claims" (*id.* at ¶ 6) and "fail[ing] to timely record losses on many of its below-investment-grade securities" (*id.* at ¶ 8). Both sets of allegations claim these actions and Defendants' failure to disclose them resulted in material overstatements of the company's income (*id.* at ¶¶ 7, 9) and caused the company's securities "to trade at artificially inflated levels throughout the Class Period" (*id.* at ¶ 10). Both complaints then proceed to allege the details of a deliberate company-wide scheme to deny and/or terminate legitimate disability claims in order to inflate

---

[7]The *Bernstein* Complaint additionally asserts claims against Defendants SSB, SSB Holdings, SPC, and CorTS Trust I under §§ 11 and 12(a)(2) of the 1933 Act (*Bernstein* Complaint at ¶¶ 190-201) and against Defendants SSB Holdings, SPC, and CorTS Trust I under § 15 of the 1933 Act (*id.* at ¶¶ 202-04). These defendants have filed a separate motion to dismiss this claim and the Court will address that motion in a later Memorandum and Order.

UnumProvident's financial results, generally tracking the allegations in the Glickenhaus Complaint and referencing the same documents and events (*Azzolini* Complaint at ¶¶ 44-71, 79-88; *Bernstein* Complaint at ¶¶ 52-84, 98). Both complaints also allege the details of Defendants' failure to comply with generally accepted accounting principles ("GAAP")[8] in accounting for impairments to its investments in below-investment-grade securities (*Azzolini* Complaint at ¶¶ 72-78, 89; *Bernstein* Complaint at ¶¶ 85-98). Both complaints employ a similar pleading method as the Glickenhaus Complaint by chronologically grouping public statements made by Defendants and quotes from analyst reports and then in a single falsity allegation paragraph explain why the preceding group of statements was false or misleading (*Azzolini* Complaint at ¶¶ 90-125; *Bernstein* Complaint at ¶¶ 99-130).

## III.  **STANDARD OF REVIEW**

At this early stage of the litigation, the Court is not called upon to determine the merits of the plaintiffs' cases, but simply to test the sufficiency of the allegations contained within their complaints. A motion to dismiss pursuant to Rule 12(b)(6) requires the Court to construe the complaint in the light most favorable to the plaintiff, *Bloch v. Ribar,* 156 F.3d 673, 677 (6th Cir. 1998); *State of Ohio ex rel. Fisher v. Louis Trauth Dairy, Inc.*, 856 F. Supp. 1229, 1232 (S.D. Ohio 1994), accept all the complaint's factual allegations as true, *Bloch*, 156 F.3d at 677; *Broyde v.*

---

[8] Generally accepted accounting principles are set by the Financial Accounting Standards Board. The purpose of these principles is to define the accounting conventions, rules, procedures, protocols, and practices necessary to constitute accepted accounting and accounting practices. These generally accepted accounting principles enjoy widespread support and acceptance among preparers of financial statements and are relied upon as authoritative by the American Institute of Certified Public Accountants and the Securities and Exchange Commission.

13

*Gotham Tower, Inc.*, 13 F.3d 994, 996 (6th Cir. 1994), and determine whether "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 101-02, 2 L. Ed. 2d 80 (1957); *see also Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 511-12 (6th Cir. 2001); *Coffey v. Chattanooga-Hamilton County Hosp. Auth.*, 932 F. Supp. 1023, 1024 (E.D. Tenn. 1996). The Court may not grant such a motion to dismiss based upon a disbelief of a complaint's factual allegations. *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995) (noting that courts should neither weigh evidence nor evaluate the credibility of witnesses); *Lawler v. Marshall*, 898 F.2d 1196, 1199 (6th Cir. 1990). Rather, the Court must liberally construe the complaint in favor of the party opposing the motion and may dismiss the case only where no set of facts could be proved consistent with the allegations which would entitle the plaintiff to a recovery. *Hishon v. Spalding*, 467 U.S. 69, 73, 104 S. Ct. 2229, 2232, 81 L. Ed. 2d 59 (1984); *Miller*, 50 F.3d at 377.

In deciding a motion to dismiss, the question is "not whether [the] plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 1686, 40 L. Ed. 2d 90 (1974); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511, 122 S. Ct. 992, 997, 152 L. Ed. 2d 1 (2002). However, bare assertions of legal conclusions are insufficient. *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988). The "complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory." *Id.* (emphasis in original).

The Court must ordinarily look to the four corners of the complaint. However, if documents are attached to, incorporated by, or specifically referred to in the complaint, they are considered part

14

of the complaint and the Court may consider them. *See Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997); *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993). In addition, the Court may also consider matters outside the complaint of which it would be proper to take judicial notice. *New England Health Care Employees Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003); *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999).

## IV. *IN RE UNUMPROVIDENT CORP. SECURITIES LITIGATION* (1:03-CV-49)

Now pending before the Court in the consolidated *In re UnumProvident Corp. Securities Litigation* action are "The UnumProvident Defendants' Motion to Dismiss the Consolidated Amended Complaint" (Court File No. 107)[9] and the "Motion of Defendant Harold Chandler to Dismiss the Consolidated Amended Complaint" (Court File No. 108).[10] Both motions are brought pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6). In ruling on these two motions, the Court has considered the supporting memorandum filed by Defendants (Court File No. 109), Glickenhaus' memorandum in opposition (Court File No. 117), Defendants' reply briefs (Court File Nos. 122, 124), and assorted notices of recent developments and/or supplemental authority, declarations in support, and responses or objections to the notices and declarations in support

---

[9]Unless otherwise noted, all docket references within § III of the instant Memorandum refer to the court file for Case No. 1:03-CV-49.

[10]Defendant J. Harold Chandler was Chairman of the Board of Directors, President, and Chief Executive Officer of UnumProvident during the Class Period. He is represented by separate counsel and filed his own motion to dismiss. However, he relies upon the UnumProvident Defendants' motion in all respects, therefore, the Court will not discuss Defendant Chandler's motion separately and will deem all arguments as having been raised by all defendants named in the Glickenhaus Complaint.

submitted by both parties (Court File Nos. 129, 130, 132, 138, 139, 140, 143, 144, 145). Glickenhaus has also filed a motion to strike certain of the appendices to Defendants' motions accompanied by a supporting memorandum (Court File No. 115, 116) to which Defendants have responded in opposition (Court File No. 121) and Glickenhaus has filed a reply (Court File No. 126). Further, Glickenhaus has filed a motion for judicial notice (Court File No. 118) and Defendants have filed a motion for oral argument (Court File No. 131).

In their motions to dismiss, Defendants offer four distinct arguments in support of dismissal: (1) Glickenhaus' claims are barred by the statute of limitations to the extent they are predicated upon an alleged company "policy" of denying disability claims which led to a misstatement of UnumProvident's financial condition; (2) the consolidated complaint fails to allege specific facts demonstrating a strong inference of fraudulent intent as required by the heightened pleading standards of the PSLRA; (3) the consolidated complaint fails to adequately plead the existence of any actionable material misstatement or omission as required by the PSLRA and Federal Rule of Civil Procedure 9(b); and (4) the consolidated complaint fails to adequately allege causation (*see generally* Court File No. 107). The Court will address each of these arguments in turn, but first the Court will address the preliminary issues surrounding certain documents offered by the parties in support of their respective positions. Because the Court finds oral argument unnecessary, the Court will **DENY** Defendants' motion requesting such (Court File No. 131). For the following reasons, the Court will **GRANT IN PART** and **DENY IN PART** Glickenhaus' motion to strike (Court File No. 115), **GRANT** Glickenhaus' motion for judicial notice (Court File No. 118), and **GRANT IN PART** and **DENY IN PART** Defendants' motions to dismiss (Court File Nos. 107, 108).

A.      **Requests for Judicial Notice and Motion to Strike**

16

The parties are not in agreement as to what materials outside the consolidated complaint the Court may properly consider in ruling on Defendants' motions to dismiss. Defendants have attached a total of thirty-four appendices to the briefs in support of their motion to dismiss (*see* Court File Nos. 109, 122) and generally request the Court take judicial notice of these documents (Court File No. 109, p. 8 n.3). Glickenhaus has filed a motion to strike certain of the documents proffered by Defendants arguing they are not properly subject to judicial notice (Court File No. 115) and has filed a separate motion requesting the Court take judicial notice of an additional document (Court File No. 118). Since all of these matters relate to the general issue of what documents outside the pleadings may be considered by the Court in ruling upon a Rule 12(b)(6) motion, the Court will address them first before proceeding to the substantive merits of the motions to dismiss.

As stated previously, the general rule is that courts are prohibited from considering matters outside the pleadings in ruling on a motion to dismiss and must confine their analysis to the four corners of the complaint. *See Weiner*, 108 F.3d at 88-89. Courts may, however, also consider other materials that are integral to the complaint, matters of public record, or otherwise appropriate for the taking of judicial notice under Federal Rule of Evidence 201. *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360-61 (6th Cir. 2001). The Federal Rules of Evidence permit the Court to take judicial notice of facts that are "not subject to reasonable dispute in that [they are] either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). A district court must take judicial notice "if requested by a party and supplied with the necessary information," Fed. R. Evid. 201(d), and such notice may be taken "at any stage of the proceeding." Fed. R. Evid. 201(f).

The parties have asked the Court to take judicial notice of a host of documents in ruling upon the motions to dismiss. With respect to most of these documents, there does not appear to be any dispute as to the propriety of the Court's taking judicial notice of the documents. Specifically, there appears to be no objection to the Court taking judicial notice of the documents attached as Appendices A and C through T filed in conjunction with Defendants' motions to dismiss (Court File Nos. 111, 112), Appendices BB through HH attached to Defendants' reply brief (Court File No. 122), and the document proffered by Glickenhaus along with its motion for judicial notice (Court File No. 118, Attch. 2, Exh. 1). These documents include pleadings and/or orders from previous litigations in a variety of other jurisdictions (Court File No. 111, Apps. A & C; Court File No. 118, Attch. 2, Exh. 1; Court File No. 122, Apps. BB-HH) and assorted UnumProvident SEC filings from 1999 through 2003 (Court File No. 111, Apps. D-I; Court File No. 112, Apps. J-T). Upon request of the respective proffering parties and in the absence of any objection, the Court will take judicial notice of these documents pursuant to Fed. R. Evid. 201. *See Lyons v. Stovall*, 188 F.3d 327, 332 n.3 (6th Cir. 1999) ("it is well-settled that '[f]ederal courts may take judicial notice of proceedings in other courts of record"); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1275-81(11th Cir. 1999) (approving practice of judicially noticing public disclosure documents filed with SEC). Accordingly, the Court will **GRANT** Glickenhaus's motion for judicial notice (Court File No. 118). However, the Court is careful to note it is only taking judicial notice of the *existence* of these documents and the specific statements and/or allegations contained within the documents. It would be improper for the Court to rely upon these documents to determine disputed factual issues and by taking judicial notice of these documents at this time the Court in no way intends to make any determination as to the truth of any of the facts alleged or otherwise asserted in the documents

18

themselves.

The parties are not in agreement, however, with respect to the propriety of the Court giving consideration to the remaining documents proffered by Defendants. Glickenhaus asks the Court to strike certain of the appendices to Defendants' motions to dismiss and references to those materials within the supporting memorandum of law (*see* Court File No. 115). Glickenhaus contends these materials constitute documents outside its consolidated complaint which are not otherwise subject to judicial notice and, therefore, are not properly relied upon in advancing a Rule 12(b)(6) motion to dismiss (Court File No. 116, pp. 1-2). The complained of appendices consist of a number of press releases from the fall of 1999 regarding previous putative class action lawsuits filed against UnumProvident (Court File No. 111, App. B) and seven SEC Forms F-4 and F-5 filed by various of the individual named defendants from December 2001 through June 2003 (Court File No. 112, Apps. U, V, W, X, Y, Z, & AA). The Court will address each group of documents in turn.

The press releases which comprise Appendix B are not relied upon or referred to in the Glickenhaus Complaint and Defendants do not appear to contend they are integral to the statements and/or allegations contained in the Complaint. Accordingly, the Court may only consider them if it concludes they are public records or are otherwise appropriate for judicial notice. The press releases contained within Appendix B are of the standard sort which 15 U.S.C. § 78u-4(a)(3)(A)(i) requires plaintiffs publish on national news wires after filing a putative securities fraud class action. These particular press releases are dated from September 30 through November 29, 1999, and provide notice of a number of similar securities fraud class actions filed against UnumProvident shortly after the June 30 merger, some of which alleged, *inter alia*, Provident had derived a "material portion of its income from a course of business operations that was based on denying valid disability

19

insurance claims" (*see, e.g.*, Court File No. 111, App. B, p. 3).

In ruling on Rule 12(b)(6) motions in securities fraud actions courts can and have taken judicial notice of information that was publicly available to reasonable investors at the time the defendant made the allegedly false statements. *See Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 617 (4th Cir. 1999); *In re Copper Mountain Secs. Litig.*, 311 F. Supp. 2d 857, 864 (N.D. Cal. 2004); *In re First Union Corp. Secs. Litig.*, 128 F. Supp. 2d 871, 883 (W.D.N.C. 2001). While each of these cases dealt with the propriety of considering press releases or other publicly available information disseminated by the defendants themselves in determining whether those defendants' public statements were facially misleading, the Court sees no reason why information disseminated by third parties which might have put Glickenhaus on notice of the alleged violation should not be considered in the context of a statute of limitations argument. Both the fact and content of the press releases are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned (*i.e.*, LexisNexis) and Glickenhaus does not appear to dispute the genuineness of any of the press releases proffered by Defendants. To the extent Glickenhaus contends the press releases are not sufficiently accurate to be subject to judicial notice on the basis they are unauthenticated hearsay (Court File No. 116, pp. 6-7), the Court notes printed materials purporting to be newspapers or periodicals are self-authenticating under Rule 902(6). *See Woolsey v. Nat'l Transp. Safety Bd.*, 993 F.2d 516, 520-21 (5th Cir. 1993) (holding magazine articles and self-promoting statements issued through press-kit and advertisements were self-authenticating under Rule 902). Accordingly, the Court will **DENY** Glickenhaus's motion to strike (Court File No. 115) with respect to the press releases comprising Appendix B to Defendants' motions to dismiss.

Defendants additionally offer seven SEC Forms F-4 and F-5 (Court File No. 112, Apps. U,

V, W, X, Y, Z, & AA) to show Defendants generally increased their holdings of UnumProvident stock during the Class Period, thus rebutting Glickenhaus's allegations Defendants' actions were motivated by a desire for personal enrichment. Glickenhaus contends these documents should be stricken because they are not integral to the consolidated complaint and are not otherwise subject to judicial notice (Court File No. 116, pp. 7-10). Defendants contend they are indeed integral to the consolidated complaint in light of Glickenhaus's allegations regarding Defendants' stock holdings and stock-based compensation (*see* Glickenhaus Complaint at ¶¶ 84-89) and, in any event, they are public disclosure documents required by law which may be judicially noticed (Court File No. 121, pp. 5-7). Irrespective of whether these SEC disclosure forms are integral to the allegations in the consolidated complaint, they are undoubtedly subject to judicial notice under Fed. R. Evid. 201. *See Jackson*, 194 F.3d at 745 (stating that in addition to documents referred to in plaintiff's complaint and central to plaintiff's claims, "[c]ourts may *also* consider public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies") (emphasis added); *see also Bryant*, 187 F.3d at 1275-81 (holding courts may take judicial notice of public SEC filings); *Cortec Indus., Inc. v. Sum Holding LP*, 949 F.2d 42, 47 (2d Cir. 1991) (holding publicly filed SEC documents may be judicially noticed under Fed. R. Evid. 201).

Glickenhaus nevertheless opposes Defendants' request for judicial notice on the basis the SEC forms are being offered to prove the truth of the matters asserted therein (Court File No. 116, pp. 9-10). Glickenhaus claims Defendants are seeking to offer the documents as proof of their state of mind and because this issue is hotly contested, judicial notice is improper. Although this may be the ultimate point, the direct purpose for which Defendants are offering the forms is one step removed. Defendants have offered the SEC forms to prove they personally acquired substantial

amounts of UnumProvident stock during the Class Period. Glickenhaus does not dispute this factual assertion, though it does note the forms omit certain details which might be relevant. Nevertheless, that the occurrence of the stock transactions is undisputed does not change the fact Defendants are offering the SEC forms for the truth of the matter asserted (*i.e.*, the occurrence of the transactions disclosed therein). Thus, while the Court could consider the SEC forms for the purpose of determining what disclosures were or were not made, the Court cannot consider them as proof of the actual activities or transactions which they purport to disclose. *See Bryant*, 187 F.3d at 1278 (making clear judicial notice is "for the purpose of determining what statements the documents contain and not to prove the truth of the documents' contents"); *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996) (noting that although court may take judicial notice of documents filed with the SEC, "[s]uch documents should be considered only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents"); *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1354-55 (7th Cir. 1995) (holding district court properly refused to take judicial notice of Form 10-K to decide facts in dispute).

Defendants claim the SEC forms are not offered to refute any specific allegation in the Glickenhaus Complaint, but simply to "provide context for the allegations of the Complaint to assist the Court in determining whether the selected snippets of facts taken by Plaintiff from public documents, in context, meets Plaintiff's burden of demonstrating a strong inference of scienter" (Court File No. 121, p. 7). Thus, according to Defendants, "the 'usual rules for considering 12(b)(6) motions are . . . bent to permit consideration of an allegedly fraudulent statement in context'" (*id.* (quoting *Harris v. Ivax Corp.*, 182 F.3d 799, 802 n. 2 (11th Cir. 1999)). However, in the case quoted by Defendants, the United States Court of Appeals for the Eleventh Circuit found it

appropriate to consider the full text of a press release which the court deemed "central to the complaint" noting such was permitted by the case law and quite possibly compelled by the PSLRA's command district courts consider not only "any statement cited in the complaint" but also "any cautionary statement accompanying the forward-looking statement, which are [sic] not subject to material dispute, cited by the defendant." *Harris*, 182 F.3d at 802 n. 2; *see also* 15 U.S.C. § 78u-5(e). By contrast, here Defendants are not asking the Court to consider the entirety of their statements and/or disclosures in determining whether those disclosures were materially misleading; instead, they are asking the Court to take judicial notice of certain facts and use those facts to diminish whatever inference of scienter might be supported by Glickenhaus's allegations. Absent a specific statutory command to the contrary, the Court cannot do this without converting Defendants' motion into one for summary judgment. Although the PSLRA imposes heightened pleading requirements in securities cases and limits the scope of inferences to which plaintiffs are typically entitled in the face of a Rule 12(b)(6) motion, it does not convert such a motion into some sort of a preliminary summary judgment motion in which the parties compare their respective collections of supporting facts and inferences. To the extent either of the district court cases cited by Defendants suggest otherwise, the Court must respectfully be in disagreement. *See In re Keithley Instruments, Inc. Secs. Litig.*, 268 F. Supp. 2d 887, 902-03 & n. 10 (N.D. Ohio 2002) (taking judicial notice of public records of stock sales by defendant which affirmatively negated inference of scienter plaintiff had sought to draw from allegations of insider trading, allegations which were already weak and incomplete when considered in isolation); *Campbell v. Lexmark Int'l Inc.*, 234 F. Supp. 2d 680, 686-87 (E.D. Ky. 2002) (considering details of stock transactions provided by defendants as painting the "rest of the picture" and concluding larger context "gives rise to

23

competing inferences that, on balance, envelop plaintiffs own inferences of scienter").[11] Accordingly, the Court will **GRANT** Glickenhaus's motion to strike (Court File No. 115) with respect to Appendices U, V, W, X, Y, Z, and AA to Defendants' memorandum in support of their motion to dismiss.

**B.    Statute of Limitations**

Defendants first contend the Glickenhaus Complaint is barred by the statute of limitations since Glickenhaus and/or the class should have been on notice of any improper claims handling practices at UnumProvident no later than the fall and winter of 1999, more than three years before the first of the instant consolidated actions was filed on February 12, 2003 (Court File No. 109, pp. 6-11). As an initial matter, the Court notes Defendants' statute of limitations arguments make no reference whatsoever to Glickenhaus's allegations regarding improper accounting for investments at UnumProvident. Consequently, the Court interprets Defendants' motion as seeking dismissal of the Glickenhaus Complaint on statute of limitations grounds only to the extent the claims asserted in the Complaint are premised upon alleged misstatements, misrepresentations, or omissions related to UnumProvident's claims processing procedures.

Due to action taken by Congress in the middle of the Class Period, articulating the statute of limitations applicable to this case is a somewhat more difficult undertaking than is typical. Previous to the commencement of the Class Period, the law required a cause of action for securities fraud under § 10(b) of the Exchange Act and Rule 10b-5 be brought within one (1) year of "discovery of the facts constituting the violation" and, in any event, within three (3) years of the

---

[11]The Court also notes both of these cases involved explicit allegations of insider trading by the plaintiff in the complaint. Glickenhaus has not presented any such allegations in this case.

violation itself. *See* 15 U.S.C. § 78i(e); *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364, 111 S. Ct. 2773, 2782, 115 L. Ed. 2d 321 (1991); *New England Health Care Employees Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 499 (6th Cir. 2003). However, as part of the Sarbanes-Oxley Act, Congress expanded the time for bringing such actions to the shorter of two (2) years from discovery or five (5) years from the violation. *See* 28 U.S.C. § 1658(b). This change became effective July 30, 2002, and does not apply retroactively to claims which had expired by that date under the old limitations period. *In re Enter. Mortgage Acceptance Co. Secs. Litig.*, 391 F.3d 401, 406-10 (2d Cir. 2004); *see also Foss v. Bear, Stearns & Co., Inc.*, 394 F.3d 540, 542 (7th Cir. 2005) (adopting Second Circuit's reasoning without further comment). As noted previously, the first of the instant consolidated actions was filed on February 12, 2003, thus in light of the two aforementioned statute of limitations rules, Glickenhaus's claims are barred if the facts constituting the alleged violation were discovered at any time prior to July 30, 2001.[12]

Discovery occurs when a potential plaintiff has either actual or inquiry notice of a violation. *New England*, 336 F.3d at 500-01; *Kauthar SDN BHD v. Sternberg*, 149 F.3d 659, 670 (7th Cir. 1998). A plaintiff has inquiry (*i.e.*, constructive) notice when the plaintiff should have, in the exercise of reasonable diligence, discovered the facts underlying the alleged fraud. *New England*, 336 F.3d at 501. At least in the United States Court of Appeals for the Sixth Circuit ("Sixth Circuit"), mere knowledge of suspicious facts or "storm clouds" does nothing more than trigger a duty to investigate, and the limitations period begins to run "only when a reasonably diligent investigation would have discovered the fraud." *Id.*; *but see Theoharous*, 256 F.3d at 1228 (defining

---

[12]Because of their derivative nature, the same limitations periods apply to § 20(a) claims. *See Theoharous v. Fong*, 256 F.3d 1219, 1228 n.12 (11th Cir. 2001).

"inquiry notice" as "knowledge of facts that would lead a reasonable person to *begin* investigating the possibility that his legal rights had been infringed") (emphasis added).

Defendants contend Glickenhaus was placed on inquiry notice by late 1999 based upon allegations raised in five putative securities fraud class actions filed in Maine and New York in 1999, the publicity surrounding those lawsuits, and UnumProvident's public disclosure of information about those suits in its SEC filings. Defendants specifically point to the allegations made by the plaintiff in *Bennett v. UnumProvident Corp., et al.* (No. 99-CV-316-PC, D. Me.), a putative securities fraud class action lawsuit filed on October 7, 1999, shortly after the merger between Unum and Provident. The plaintiff in *Bennett*, who was represented by the same law firm which now serves as lead counsel in the instant consolidated action, specifically alleged "Provident misrepresented its financial condition and failed to disclose adverse trends by engaging in a scheme to improperly deny disability claims made by its insureds in order to materially overstate profits" (Court File No. 111, App. A ¶ 26) and Provident was violating state law and "deriving a significant and material portion of its income from a course of business operations that was based on denying valid disability insurance claims" (*id.* at ¶ 103). The *Bennett* complaint additionally cited to a civil action filed by Provident policyholders in California alleging Provident deliberately sought to inflate its profits "by reducing claim payments [primarily to] high end holders of its disability policies" and did so by setting denial targets in the form of "net termination ratio" goals, developing a list of biased physicians, instructing staff to avoid putting things in writing, shredding papers, and holding "roundtable meetings" to find ways to "target, terminate and deny claims" (*id.* at ¶¶ 29-31).

In addition, Defendants have provided the Court with more than seventy press releases published on national news wires from September 30 through November 29, 1999, providing notice

26

of the *Bennett* action and other similar securities fraud class actions. Some, but not all, of these press releases specifically state the lawsuit alleges Provident was "understating reserves for disability insurance claims" and derived a "material portion of its income from a course of business operations that was based on denying valid disability insurance claims" (*see* Court File No. 111, App. B). In addition, Defendants claim the existence and nature of these lawsuits were disclosed in its SEC filings beginning with its September 1999 Form 10-Q and continuing through the 2001 fiscal year (*see* Court File No. 111, Apps. C-I; Court File No. 112, J-O). Finally, Defendants have provided a copy of the California state court complaint (*United Policyholders v. Provident Life & Accident Ins. Co.*, Alameda County (Cal.) Sup. Ct.) referenced in the *Bennett* complaint wherein the plaintiffs alleged Provident had engaged in unfair business practices with respect to its "own occupation" disability policies by developing "deliberate plans to increase profits by reducing claim payments" irrespective of their merits (Court File No. 122, App. BB, ¶¶ 14-17).

Glickenhaus initially insists the question of whether and when it was on "inquiry notice" is a fact issue which cannot be resolved on a motion to dismiss (Court File No. 117, pp. 37-38). Although the question of whether and when a particular plaintiff is deemed to have been placed on inquiry notice of the existence of fraud is typically a factual determination inappropriate for resolution on a motion to dismiss, courts can and have granted Rule 12(b)(6) motions on statute of limitations grounds where the complaint, all papers integral to the complaint, and any other materials which are public records or are otherwise appropriate for the taking of judicial notice affirmatively demonstrate the plaintiff can prove no set of facts under which he should not have known of the fraud at some time outside the limitations period. *See New England*, 336 F.3d at 501; *Marks v. CDW Computer Centers, Inc.*, 122 F.3d 363, 367 (7th Cir. 1997); *Dodds v. Cigna Secs., Inc.*, 12 F.3d 346,

352 n.3 (2d Cir. 1993). With this high standard in mind, the Court will proceed to consider the merits of Defendants' argument and determine whether the consolidated complaint and the materials proffered by the parties operated to place Glickenhaus on inquiry notice as a matter of law on or before July 30, 2001.

Defendants claim allegations Provident employed a policy of denying legitimate claims resulting in an understatement of reserves and an overstatement of profits were "a matter of public record since at least 1999"; therefore, since UnumProvident quite clearly disclosed its intention to adopt Provident's claims handling and reserve calculation methods following the merger (*see* Glickenhaus Complaint at ¶¶ 32, 52), Glickenhaus was on inquiry notice of the company's practices and their potential effect on its financial condition. Glickenhaus contends the *Bennett* action cited prominently by Defendants was insufficient to put it on inquiry notice because that complaint involved completely different allegations of fraud related to the 1999 merger of Unum and Provident, made "only passing reference" to allegations of fraudulent claims practices, and, in any event, Defendants' denials and reassurances tempered any "storm warnings" the litigation may have created (Court File No. 117, pp. 36-43). The Glickenhaus Complaint specifically alleges Defendants' scheme to overstate income by terminating legitimate claims so as to move their corresponding reserves off the books was developed at Provident "[b]eginning in late 1994" (Glickenhaus Complaint at ¶ 35), the scheme was implemented, monitored, and refined over the ensuing years (*id.* at ¶¶ 35-51), and was implemented company-wide following the June 1999 merger with Unum (*id.* at ¶¶ 52, 54-66). Thus, Glickenhaus concedes the alleged fraud was in existence as early as 1994, but maintains the facts surrounding this scheme had not been sufficiently brought to light so as to commence the running of the statute of limitations until the publication of

various media reports in the fall of 2002.

Despite Glickenhaus's protestations to the contrary, the *Bennett* and *United Policyholders* complaints clearly present allegations of the sort of fraudulent claims handling practices upon which Glickenhaus's securities fraud claim now centers. In fact, the Glickenhaus Complaint appears to rely on many of the same internal memoranda, monthly reports, and other documents cited in and attached to the *United Policyholders* complaint (*compare* Court File No. 122, App. BB, ¶¶ 13-19 & Exhs. 1-14, *with* Glickenhaus Complaint at ¶¶ 35-51). The Glickenhaus Complaint certainly provides greater detail and cites to additional sources beyond those referenced in the *United Policyholders* complaint, but a good number of the details of the alleged unlawful practices are identical (*e.g.*, both allege the company calculated and tracked a figure termed the "net termination ratio," developed a list of independent medical examiners likely to deny claims, held roundtable meetings at which no notes were kept, and compiled lists of claims targeted for termination). However, the parties have not informed the Court of the ultimate disposition of this lawsuit and any publicity it may have received other than its reference in the *Bennett* complaint. Further, none of the disclosure forms appended to Defendants' memorandum provide any specific details about the *United Policyholders* action (*see, e.g.*, Court File No. 111, App. D, p. 26).[13] As such, it is difficult to assess the extent to which the allegations in the *United Policyholders* complaint should have

_____

[13]The *United Policyholders* complaint is not specifically mentioned in any of the Form 10-Ks and Form10-Qs provided to the Court (Third Quarter-1999 through 2001), thus any disclosures related to that action would have to fall within the following catch-all disclosure: "Various other lawsuits against the Company have arisen in the normal course of its business. Contingent liabilities that might arise from such other litigation are not deemed likely to materially affect the financial position or results of operations of the Company" (*see* Court File No. 111, App. D, p. 26; App. E, p. 91; App. F, p. 12; App. G, p. 13; App. H, p. 13; App. I, p. 90; Court File No. 112, App. J, p. 13; App. K, p. 14; App. L, p. 15; App. M, p. 89; App. N, p. 13; App. O, p. 12).

prompted Glickenhaus to become concerned about UnumProvident's claims handling and reserve practices.

Although the *Bennett* complaint did contain allegations UnumProvident was misrepresenting its income through a concerted scheme designed to understate reserves by denying valid disability claims (Court File No. 111, App. A ¶¶ 26, 103), the primary thrust of the allegations in that action was that Umum had been materially overstating earnings by "severely" underpricing its disability insurance products and setting and maintaining inadequate initial claim reserves in violation of GAAP (*see id.* at ¶¶ 21-25, 27-28, 32-55). Significantly, the claims handling allegations were abandoned in the amended complaint which was later filed following the consolidation of the *Bennett* action with *Giarraputo v. UnumProvident Corp., et al.* (No. 99-301-PC, D. Me.) and other similar putative class actions. The *Giarraputo* consolidated amended complaint made no mention of improper claims handling practices and confined its allegations to a failure to set and maintain adequate initial claim reserves, underpricing, and improper accounting for "reasonable and estimable expenses including losses on discontinued business and merger costs" (*see generally* Court File No. 118, Attch. 2, Exh. 1 ¶ 6). Further, while UnumProvident's disclosures regarding these consolidated class action lawsuits did at least vaguely disclose allegations regarding the company's claims handling practices had been raised in the context of a securities fraud action, those disclosures did not provide a wealth of detail. The company's September 1999 Form 10-Q stated five class action lawsuits had been filed in federal court in Maine alleging "the defendants made false and misleading public statements concerning, among other things, Unum's and the Company's reserves for disability insurance, Provident's and the Company's *disability insurance claims and pending lawsuits concerning certain of those claims*, and the Company's merger costs and the adequacy of

the due diligence reviews performed in connection with the merger" (Court File No. 111, App. D, p. 26) (emphasis added). Beginning with its 1999 Form 10-K, the company's SEC filings described the allegations in the consolidated class actions pending in Maine as involving "false and misleading public statements concerning, among other things, Unum's and the Company's reserves for disability insurance *and pricing policies*, the Company's merger costs, and the adequacy of the due diligence reviews performed in connection with the merger" (Court File No. 111, App. E, p. 91; App. F, p. 11; App. G, pp. 12-13; App. H, pp. 12-13; App. I, p. 89; Court File No. 112, App. J, pp. 12-13; App. K, pp. 12-13; App. L, p. 14; App. M, pp. 88-89; App. N, pp. 11-12; App. O, pp. 11-12) (emphasis added). As such, UnumProvident's own disclosures reflected the peripheral and ultimately discarded nature of those allegations which are directly in line with those made in the Glickenhaus Complaint. Additionally, throughout the *Giarraputo* litigation UnumProvident consistently stated in its SEC filings that it "disputes the claims alleged in the complaints and plans to vigorously contest them" (*See, e.g.*, Court File No. 111, App. D, p. 26). The *Giarraputo* action was ultimately settled in October 2001 for the amount of $45 million and the district court approved settlement and entered judgment in June 2002 (Court File No. 112, App. L, p. 14; App. M, p. 89; App. N, p. 12; App. O, p. 12).

In summary, while allegations of improper and/or fraudulent claims practices had been made in two different putative class action lawsuits by October 1999, it does not appear those claims were ever actually litigated, UnumProvident does not appear to have ever disclosed any details of one of these actions in its SEC filings, and the other set of allegations were affirmatively discarded by a superseding pleading. The mere fact of an allegation of corporate wrongdoing, standing alone, cannot be sufficient to place a potential securities fraud plaintiff on inquiry notice. *See In re Ames*

31

*Dept. Stores, Inc. Note Litig.*, 991 F.2d 968, 980-81 (2d Cir. 1993) (holding class action complaint by common stockholders did not serve to put holders of debt securities on notice of their own fraud claims while noting "[t]here are a lot of stockholder suits out there, so to speak"); *Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*, 840 F. Supp. 243, 249-54 (S.D.N.Y. 1993) (holding pendency of three civil actions relating to company's recapitalization plan were insufficient indicium of fraud to put plaintiffs on inquiry notice as a matter of law). Such allegations, however, can give rise to inquiry notice if accompanied by other facts such as an admission of error by the company, a precipitous decline in stock price, negative media and analyst reports, factual discrepancies in publicly available documents, or the initiation of federal or state criminal investigations and/or charges. *See Enter. Mortg. Acceptance Co., LLC, Secs. Litig.*, 391 F.3d 401, 411 (2d Cir. 2004) (finding reasonable investor would have been put on inquiry notice of accountant's potential liability by series of published articles which suggested corporation had been engaging in "accounting gimmicks" and other "creative accounting" practices); *LC Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 155 (2d Cir. 2003) (affirming grant of Rule 12(b)(6) motion on timeliness grounds where company had made three reserve charges of substantial and increasing amounts within a brief period of time, article had been published regarding company's reserve problems, and one previous lawsuit had been filed); *Menowitz v. Brown*, 991 F.2d 36, 42 (2d Cir. 1993) (finding inquiry notice where defendant-company's SEC filings had disclosed a large number of civil lawsuits including two putative class actions, an FTC investigation, a grand jury investigation accompanied by subpoenas, and a seizure by state officials of books and records, all of which related to the alleged improper and/or fraudulent practices which formed basis of plaintiff's misrepresentation allegations). In this case, Defendants have pointed to what is in effect a single

previous allegation of improper claims handling practices in a state putative class action lawsuit brought on behalf of UnumProvident's customers. The allegations in the *United Policyholders* complaint were reported in the *Wall Street Journal* and reiterated in the *Bennett* securities fraud complaint, but the record currently contains no further information regarding the publicity surrounding these allegations or the ultimate resolution of the case in which the allegation was initially made. Moreover, Glickenhaus does not appear to have been a party to any of those lawsuits, though its attorneys were involved in the *Bennett* action. While the fact a party has itself made a previous allegation of fraud might well be dispositive of the question of inquiry notice, *see New England*, 336 F.3d at 501 (affirming district court's dismissal of securities fraud complaint against auditor as untimely based entirely upon fact and nature of *same* plaintiff's earlier complaint against audited corporation), the fact that party's attorneys made such an allegation at some point in the past while representing another party does not carry the same force. Accordingly, the Court finds insufficient grounds to support the somewhat extraordinary conclusion that Glickenhaus can prove no set of facts under which it would not have known of the alleged fraud at some time outside the limitations period so as to make the instant action time-barred as a matter of law.[14]

## C.     Failure to State a Claim for Securities Fraud

Defendants next contend Glickenhaus's allegations are insufficient to state a claim for securities fraud because the consolidated complaint fails to (1) allege specific facts demonstrating a strong inference of fraudulent intent, (2) adequately plead the existence of any actionable material misstatement or omission, and/or (3) adequately allege causation (Court File No. 107, pp. 11-42).

---

[14] In reaching this conclusion the Court is of course not foreclosing a later motion for summary judgment where the Court would be in a position to review the facts supporting the claim. At this stage of the litigation the Court is simply reviewing the legal adequacy of the claim.

33

In order to state a claim under § 10(b) and Rule 10b-5, "a plaintiff must allege: (1) a misrepresentation or omission; (2) of a material fact the defendant had a duty to disclose; (3) made with scienter; (4) justifiably relied on by the plaintiff; and (5) proximately causing him injury. *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 668 (6th Cir. 2005); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 554 (6th Cir. 2001) (en banc); *see also In re Comshare Inc. Secs. Litig.*, 183 F.3d 542, 548 (6th Cir. 1999) (stating "plaintiff must allege in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury"). Defendants challenge the adequacy of Glickenhaus's allegations as to the first, second, third, and fifth elements. As referenced earlier in the Court's recitation of facts, Glickenhaus's securities fraud claim is premised upon two general sorts of misrepresentations allegedly disseminated by Defendants: (1) statements and/or omissions relating to UnumProvident's claims handling practices and maintenance of claim reserves (hereinafter, "alleged claims handling misrepresentations"), and (2) statements and/or omissions relating to UnumProvident's accounting for investments and the company's general investment policy and portfolio (hereinafter, "alleged investment misrepresentations"). The Court will attempt to address Defendants' arguments as fully as possible by giving separate consideration to each argument as it relates to each of these two groups of allegations.

### 1. Material Misstatements and/or Omissions

Defendants first contend Glickenhaus has failed to adequately plead the existence of any actionable material misstatement or omission. A statement is said to be "actionable" when it satisfies the first two elements of a securities fraud claim (*i.e.*, it is a misrepresentation or omission of a material fact the defendant had a duty to disclose). *City of Monroe*, 399 F.3d at 668. Where

a complaint alleges fraud or misrepresentation, Federal Rule of Civil Procedure 9(b) mandates "the circumstances constituting fraud or mistake shall be stated with particularity." Additionally, the PSLRA requires plaintiffs asserting claims under § 10(b) and Rule 10b-5 to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, [to] state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

### a. Alleged Claims Handling Misrepresentations

As detailed previously (*see supra* § II.C), the Glickenhaus Complaint cites and quotes a number of statements made by Defendants in SEC filings, offering materials, annual reports to shareholders, press releases, media interviews, and presentations. These statements are then grouped chronologically along with allegations of fluctuations in the company's stock price and assessments from analysts. Following each group of statements is a falsity allegation paragraph which seeks to explain how and why the previous statements were false or misleading. Glickenhaus's allegations regarding UnumProvident's claims handling procedures and reserves maintenance practices are largely intertwined. In short, Glickenhaus alleges Defendants instituted a company-wide policy pursuant to which disability claims were approved or denied based not upon merit, but instead according to pre-determined financial objectives designed to maximize the amount of claims reserves which could be eliminated from the company's books and then recognized as income on the company's financial statements (*see* Glickenhaus Complaint at ¶¶ 8, 34-66, 98-100, 102-04). Defendants contend Glickenhaus has alleged nothing more than inactionable corporate mismanagement, Defendants were under no duty to disclose the improper and/or unlawful nature of the company's claims practices, and the consolidated complaint does nothing more than generally

35

allege UnumProvident maintained inadequate reserves and provides no detail as to the actual and/or proper amount of those reserves, how the company's reserves were insufficient to cover its allegedly excessive liabilities, or that those reserves were calculated in a manner inconsistent with the company's disclosed procedures (Court File No. 109, pp. 29-35).

With respect to the first aspect of Defendants' argument, it is true "[m]ere mismanagement or inaccurate predictions" are insufficient to establish a securities fraud violation. *Auslender v. Energy Mgmt. Corp.*, 832 F.2d 354, 357 (6th Cir. 1987). However, even assuming a knowing and intentional violation of the law could be written off as nothing more than poor business judgment, several courts have recognized a securities fraud claim where a plaintiff alleges the defendant(s) made certain statements despite knowing that existing mismanagement made those statements false or misleading. *See In re Wells Fargo Secs. Litig.*, 12 F.3d 922, 927 (9th Cir. 1993); *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992); *Fidel v. AK Steel Holding Corp.*, No. C-1-00-320, 2002 WL 31545952, at *5 (S.D. Ohio Sept. 19, 2002) (unpublished opinion). Here, Glickenhaus has alleged Defendants conceived, instituted, and oversaw a claims handling strategy which was, at best, unethical and then both failed to credit this conduct as the cause of the company's success and knowingly failed to reflect the potential liabilities in the company's financial disclosures. Therefore, even assuming Defendants' alleged claims practices themselves constitute mere mismanagement, Glickenhaus has adequately alleged Defendants knowingly failed to account for the potential repercussions of those practices in its statements regarding the company's finances.

The second component of Defendants' argument contends Glickenhaus's claims must fail as a matter of law to the extent they are predicated upon the proposition Defendants were obligated under the federal securities laws "to confess publicly to having engaged in some unlawful claims

practices that could have a deleterious effect on its business" (Court File No. 109, p. 34). Effectively, Defendants argue the securities laws should not be read so as to force them into the Hobbesian dilemma of having to chose between publicly confessing misconduct and exposing themselves (and the company) to potential civil and/or criminal liability, or remaining silent and facing potential liability in a securities fraud action based upon a failure to disclose the misconduct earlier (*see id.* at 34-35 (citing *Lewis v. Chrysler Corp.*, 949 F.2d 644, 652 (3d Cir. 1991), and *Kademian v. Ladish Co.*, 792 F.2d 614, 622 (7th Cir. 1986)). To be sure, the federal securities laws do not create an affirmative duty on the part of a company to disclose the details of its business practices, opine as to their legality, or make predictions as to the likelihood and/or impact of potential litigation surrounding those practices. *See In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 399-401 (6th Cir. 1997); *Morse v. McWhorter*, 200 F. Supp. 2d 853, 858-61 (M.D. Tenn. 2000), *vacated on other grounds*, 290 F.3d 795 (6th Cir. 2002). However, "even absent a duty to speak, a party who discloses material facts in connection with securities transactions assume[s] a duty to speak fully and truthfully on those subjects." *Helwig*, 251 F.3d at 561.

The Glickenhaus Complaint repeatedly cites to statements by Defendants which detail UnumProvident's claim reserves practices (*see* Glickenhaus Complaint at ¶¶ 103, 193, 198, 209, 217; *see also id.* at ¶¶ 150, 166), statements which at least imply the company reviewed each individual claim on its merits and established a claim reserve based upon the specifics of that particular claim (*see id.* at ¶ 104). Further, Glickenhaus also alleges Defendants specifically credited the company's improved performance to factors such as integrated product strategies, improved customer service, strong investment performance, disciplined expense management, improved claims management effectiveness, improved sales comparisons, *etc.* (*see* Glickenhaus Complaint

at ¶¶ 131, 133-35, 138, 143-44, 149-50, 155-56, 158, 165-67, 171, 174, 178-79, 184-85, 191-92, 195-97, 199).[15] Accordingly, Glickenhaus has at least alleged facts giving rise to a duty to disclose. *See Morse*, 200 F. Supp. 2d at 860-61 (holding that although defendants had no duty to opine as to the legality of company's business practices, plaintiffs had adequately alleged an actionable misstatement or omission where they also alleged defendants failed to disclose fact of those practices); *cf. Sofamor Danek*, 123 F.3d at 399-402 (holding company which marketed certain medical devices for uses not yet approved by FDA and had disclosed what it was doing and that it had received warning from FDA had no further duty to disclose "soft information" such as predictions regarding future regulatory actions or losses the company might suffer as a result).

The Court notes both of the cases cited by Defendants in support of their argument they had no duty to disclose their allegedly illegal conduct deal with the failure of corporate officers and directors to disclose the self-serving motives or intent underlying their actions and in neither case was there any allegation the defendants' disclosures were themselves inaccurate or misleading. *Lewis*, 949 F.2d at 651-52 (holding defendant's failure to disclose management's entrenchment plan did not state claim under federal securities law); *Kademian*, 792 F.2d at 624 (holding failure to disclose "true reasons" for merger was not misleading where there was no allegation any of facts

---

[15]According to Glickenhaus, Defendants repeatedly characterized UnumProvident as a "turnaround" story or company in conjunction with references to these often vague factors. Glickenhaus explicitly disclaims any intent to rely upon Defendants' characterization of UnumProvident as a "turnaround" story or company as an independent, actionable misstatement (Court File No. 117, p. 33) as such a statement of generalized corporate optimism, standing alone, would amount to nothing more than unactionable puffery. *See City of Monroe*, 399 F.3d at 671 ("such statements . . . are too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision"). However, Defendants' attributions of success to specific investments or measures in support of their general turnaround spin could themselves be misstatements if made in light of their knowledge of the ongoing claims handling scheme.

actually disclosed were false). Moreover, as a matter of public policy, the Court is extraordinarily reluctant to interpret the securities laws so as to immunize corporate officers and directors who knowingly implement fraudulent and/or unlawful business practices yet fail to disclose at least the fact of those activities to investors. While the Court is aware "[m]ateriality alone is not sufficient to place a company under a duty of disclosure," *Sofamor Danek*, 123 F.3d at 400, as a general matter the laws should be interpreted so as to thwart fraud and deceit. The fact of one fraud should not operate to legally sanction the perpetration or concealment of another. *See In re Enron Corp. Secs., Deriv. & ERISA Litig.*, 284 F. Supp. 2d 511, 565 (S.D. Tex. 2003) ("As a matter of public policy, the statutes should be interpreted to require that persons *follow* the laws, not undermine them.") (emphasis in original).

Defendants also contend there is nothing at all materially misleading in the statements enumerated in the Glickenhaus Complaint. In doing so, Defendants argue the Glickenhaus Complaint does nothing more than generally allege UnumProvident maintained inadequate reserves and provides no detail as to the actual or proper amount of those reserves, how the company's reserves were insufficient to cover its allegedly excessive liabilities, or that those reserves were calculated in a manner inconsistent with the company's disclosed procedures (Court File No. 109, pp. 29-34). Glickenhaus responds by claiming Defendants misinterpret the nature of its allegations (Court File No. 117, pp. 26-30). In subparagraphs (b) of each falsity allegation section, Glickenhaus alleges Defendants' statements concerning UnumProvident's reserves were false and misleading because they failed to disclose the company's reserves "were 'managed' by unlawfully and improperly denying and terminating legitimate disability claims" and this practice caused the company to understate its reserves and its liabilities while overstating its earnings (*see, e.g.*,

39

Glickenhaus Complaint at ¶ 134(b)). Further, in subparagraph (d), Glickenhaus alleges UnumProvident "failed to provide adequate reserves" and, as a result, overstated income and earnings on its financial statements and understated reserves "by more than $450 million" during the class period (*see, e.g.*, *id.* at ¶ 134(d)). Glickenhaus explicitly disclaims any challenge to the validity of Defendants' initial reserve estimates or the compliance of those initial estimates with UnumProvident's established and disclosed policies and procedures (Court File No. 117, pp. 27-28). Accordingly, Glickenhaus does not appear to challenge UnumProvident's reserves setting policy as such (*see* Glickenhaus Complaint at ¶ 103) or Defendant's compliance with that policy with respect to the estimation of policy reserves (*i.e.*, reserves for claims not yet incurred) or the estimation of initial claim reserves (*i.e.*, reserves for those claims which have accrued and on which future benefits are to be paid). Rather, Glickenhaus maintains its allegation is that Defendants intentionally manipulated the company's claim reserves *after* they were initially set by taking reserves into income once the underlying claim was terminated and failing to reflect the continuing present value of the liability on those claims in light of the fact UnumProvident was engaged in the systematic denial of legitimate claims, thus understating reserves and liabilities and overstating the company's income (Court File No. 117, pp. 27-30). Therefore, it appears Glickenhaus has alleged, at least at a general level, why and how Defendants' representations as to UnumProvident's claims reserves, liabilities, and income during the Class Period were false and/or misleading.

Defendants maintain Glickenhaus's allegations lack the specificity required by Rule 9(b) and the PSLRA since they do not allege the particular amount by which reserves were misstated and how any such misstatement was material in light of the company's overall financial condition. Glickenhaus does not identify any particular claim which was wrongfully denied nor does

40

Glickenhaus attempt to approximate the number of such claims which existed during the Class Period. Glickenhaus does allege Defendants' actions resulted in UnumProvident's claim reserves being understated by more than $450 million during the Class Period (*see, e.g.*, Glickenhaus Complaint at ¶ 134(d)), and presumably the company's income was overstated by a similar amount. However, this appears to be, at best, a low-ball estimate based on little more than the fact and amount of UnumProvident's 2003 restatement of its group disability claims reserves (*see id.* at ¶¶ 100-01).[16] Nonetheless, the Court finds Glickenhaus's lack of specificity as to the particular transactions executed consistent with Defendants' allegedly fraudulent scheme does not require dismissal since Glickenhaus has alleged the particulars of that overarching scheme.

Defendants cite to several securities fraud cases in support of their argument Glickenhaus is required to provide greater detail in order to allege an actionable misstatement. *See Roots P'ship v. Lands' End, Inc.*, 965 F.2d 1411, 1419 (7th Cir. 1992) (finding lack of particularity where plaintiff alleged only that defendants had "failed to establish adequate reserves for its excessive and outdated inventory" but did not allege what company's reserves actually were or should have been); *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 116 (2d Cir. 1982) (affirming dismissal of complaint generally alleging improper accounting for assets where plaintiff described three particular assets but failed to allege the figures at which they were carried on the company's books or the approximate figures at which they should have been carried); *Schiller v. Physicians Res. Group, Inc.*,

_____

[16]Defendants object to Glickenhaus's reliance upon this restatement of UnumProvident's *group* claims reserves on the basis Glickenhaus's allegations of misstatements relate exclusively to UnumProvident's *individual* disability claims reserves (Court File No. 109, pp. 31-32). However, the Court is unable to locate anything in the consolidated complaint expressly limiting Glickenhaus's claims in such a manner, though Glickenhaus does note "most of the controversy surrounding [UnumProvident's] unfair claims practice actually occurred in the individual disability segment rather than the group disability segment" (Glickenhaus Complaint at ¶ 101).

No. 97-3158, 2002 WL 318441, at *13 (N.D. Tex. Feb. 26, 2002) (unpublished opinion) (dismissing complaint alleging, *inter alia*, defendants had failed to accrue adequate reserves for uncollectible accounts receivable without also alleging what accounts receivable were uncollectible, when they became due, why they are presently uncollectible, why defendants knew they could not reasonably expect to recover on those accounts, what percentage of all accounts were uncollectible, what reserves were allocated, what reserves should have been taken, and the significance of any overstated receivables in relation to the company's overall financial picture). The Court, however, finds these cases distinguishable from the instant action in that they all deal with a broad general allegation of improper accounting followed up with no details whatsoever. Here, Glickenhaus broadly alleges Defendants understated UnumProvident's disability claim reserves, but also specifically alleges Defendants did so by systematically denying legitimate claims based upon a predetermined amount of reserves management desired to eliminate and then failing to reflect the resulting potential liabilities in the amount of disability claim reserves (*see* Glickenhaus Complaint at ¶¶ 8, 34-66, 98-100, 102-04). Accordingly, Glickenhaus has alleged the particular method by which Defendants engaged in a pattern of misstating claim reserves and it need not provide precise details of all the specific transactions which constituted this pattern. *See Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 79-81 (1st Cir. 2002). Further, it should be noted none of the cases cited by Defendants affirmatively requires securities fraud plaintiffs to plead each and every one of the allegations whose absence was cited in those cases; rather, these transactional particulars were simply cited as *possible* ways in which the plaintiffs could have satisfied Rule 9(b) and/or the PSLRA. *See In re Cabletron Sys., Inc.*, 311 F.3d 11, 32 (1st Cir. 2002) ("Each securities fraud complaint must be analyzed on its own facts; there is no one-size-fits-all template."); *Helwig*, 251

42

F.3d at 551 ("In enacting the PSLRA, Congress was concerned with the quantum, not type, of proof."); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 204 (1st Cir. 1999) (dismissing complaint based upon "complete absence" of particulars but refusing to hold approximate amounts of overstatements, dates of transactions, and/or identities of those involved *must* appear in a complaint).

Defendants also challenge the sufficiency of Glickenhaus's allegations with respect to the materiality of any misstatements which might be alleged. Materiality is a mixed question of law and fact typically reserved for the trier of fact. *Helwig*, 251 F.3d at 563. A fact is material if it is substantially likely "that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32, 108 S. Ct. 978, 983, 99 L. Ed. 2d 194 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S. Ct. 2126, 2132, 48 L. Ed. 2d 757 (1976)); *see also Helwig*, 251 F.3d at 563. Information which "would have assumed actual significance in the deliberations of a reasonable shareholder" is material. *TSC Indus.*, 426 U.S. at 449, 96 S. Ct. at 2132. A securities fraud complaint should not be dismissed at this stage of the proceedings on the basis the alleged misstatements or omissions are immaterial "'*unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance*.'" *Helwig*, 251 F.3d at 563 (emphasis in original) (quoting *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 162 (2d Cir. 2000)). Although the Glickenhaus Complaint fails to pin down an approximation of the amount by which UnumProvident's reserves and income were misstated as a result of Defendants' actions or provide any detail as to how that amount fits into the greater context of the company's overall financial situation, it is difficult to say the fact UnumProvident was systematically denying legitimate claims pursuant to clandestine corporate

43

policy in order to meet financial targets would be "obviously unimportant to a reasonable investor," even assuming the actual monetary impact on the company's balance sheet was relatively minor. Accordingly, the Court finds no basis for concluding the alleged claims handling misrepresentations were immaterial as a matter of law.

### b. Alleged Investment Misrepresentations

In subparagraph (c) of each of the falsity allegation sections, Glickenhaus alleges any statements regarding UnumProvident's investments and net income were false and misleading because they failed to disclose the company was carrying impaired assets that should have been written off, failed to disclose the company's "general investment policy and portfolio," and failed to provide specific information about the company's actual investments (*i.e.*, types, period of time in unrealized loss position, and amounts and reasoning for write-downs due to other-than-temporary impairments), all in violation of GAAP (*see, e.g.*, Glickenhaus Complaint at ¶ 134(c)). Defendants contend the Glickenhaus Complaint fails to allege any facts establishing a material misstatement concerning UnumProvident's accounting for impaired assets and, in any event, Defendants were under no duty to disclose information regarding its general investment policy or actual investments (Court File No. 109, pp. 35-39).

Taking the second argument first, there are two significant limitations to the law's general policy of disclosure: the information must be both (1) material, and (2) subject to a duty of disclosure. *See City of Monroe*, 399 F.3d at 669 ("In order to be actionable, a misrepresentation or omission must pertain to material information that the defendant had a duty to disclose . . . ."); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1432 (3d Cir. 1997) ("[T]here is no general duty on the part of a company to provide the public with all material information."). "A duty to

44

affirmatively disclose 'may arise when there is insider trading, a statute requiring disclosure,' or . . . 'an inaccurate, incomplete or misleading prior disclosure.'" *City of Monroe*, 399 F.3d at 669 (quoting *In re Digital Island Sec. Litig.*, 357 F.3d 322, 329 n. 10 (3d Cir. 2004)). To the extent Glickenhaus' claims rest upon a failure to disclose UnumProvident's investment policy and portfolio, Defendants contend there is simply no duty to disclose such information. Glickenhaus argues GAAP, specifically the Financial Accounting Standard Board's Statement of Financial Accounting Standards ("SFAS") No. 115, explicitly requires disclosure of such information (Court File No. 117, pp. 30-32; Glickenhaus Complaint at ¶¶ 69, 119-22). Therefore, according to Glickenhaus, because Defendants' financial statements violated GAAP, they were false and misleading.

Defendants contend a duty to disclose cannot be created "based solely upon GAAP" and claim the Sixth Circuit suggested as much in *Sofamor Danek* (Court File No. 122, p. 23). While it is true allegations of GAAP violations are insufficient, standing alone, to state a securities fraud claim, this is because the mere fact of a technical violation "does not in and of itself lead to an inference of scienter." *Fidel v. Farley*, 392 F.3d 220, 230 (6th Cir. 2004). Thus, while the absence of anything more than an allegation of a failure to make a particular disclosure required by GAAP might fail to state a securities fraud claim for other reasons, the Court is hesitant to broadly hold that GAAP alone cannot impose a duty to disclose. The Court acknowledges some of the language employed by the Sixth Circuit in *Sofamor Danek* could be read to support the sort of argument advanced by Defendants. *See* 123 F.3d at 402-03 (finding alleged violation of disclosure obligation imposed by provision of SEC Regulation S-K does not create an independent private right of action and describing as "unpersuasive" argument defendants' disclosure duty under Rule 10b-5 could flow

45

from that provision). However, in light of the Court's holding earlier that Glickenhaus has failed to adequately plead scienter in connection with its investment-related allegations, the Court need not make a definitive ruling on this point and will assume Defendants were in fact under an affirmative duty to disclose the investment information upon which Glickenhaus premises its securities fraud claim. Further, the Court concludes Glickenhaus has alleged sufficient facts and circumstances to preclude a conclusion these omissions were "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *See Helwig*, 251 F.3d at 563. Specifically, Glickenhaus has alleged such disclosures would have revealed the particularly poor quality of UnumProvident's investments, the company's lack of liquidity in its bond holdings, and the substantial nature and extent of the unrealized losses the company was carrying (Glickenhaus Complaint at ¶¶ 119-26). It cannot be said, at least at this early stage of the litigation, that this information was "obviously unimportant" and would not have assumed actual significance in the deliberations of a reasonable shareholder. *TSC Indus.*, 426 U.S. at 449, 96 S. Ct. at 2132.

Returning to the first argument, Defendants challenge the sufficiency of the Glickenhaus Complaint's allegations regarding the company's accounting for impaired investments. Glickenhaus alleges UnumProvident's 2000, 2001, and 2002 financial statements were prepared in violation of GAAP and SEC rules because they improperly accounted for non-temporary impairment of the company's investments in below-investment-grade securities (Glickenhaus Complaint at ¶¶ 10, 83, 105-18). Specifically, Glickenhaus alleges the company failed to comply with SFAS No. 115's requirement that if the fair value of an available-for-sale debt security falls below the amortized cost basis and that decline "is judged to be other than temporary," the company must assign the security

46

a new cost basis equal to the current fair value and reflect the amount of this write-down in the company's earnings (*see id.* at ¶ 108). Such allegations prompted an SEC investigation and, on March 24, 2003, UnumProvident downwardly restated its net aggregate income over fiscal years 2000 through 2002 by $29.1 million (*id.* at ¶¶ 110-16). Glickenhaus further alleges that through the third quarter of 2003, UnumProvident was continuing to recognize losses on junk bond investments through either write-downs or sales which should have been realized earlier, during the Class Period, if Defendants had complied with GAAP (*id.* at ¶ 118). Thus, Glickenhaus contends UnumProvident's financial statements during the Class Period were false and misleading because they failed to adequately disclose the extent of the unrealized losses the company was carrying on its portfolio of junk bond investments (*see, e.g.*, *id.* at ¶ 134(c) & (d)).

Defendants claim Glickenhaus's allegations are insufficient because they fail to state with particularity when and why the disputed assets should have been written down and how the failure to do so was material. A bare allegation statements in one report should have been made in earlier reports does not state a claim for securities fraud. *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 891 (8th Cir. 2002); *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir. 1999). To be sure, at no point does Glickenhaus ever allege which particular Form 10-K or Form 10-Q should have included what write-downs for which investments. However, Glickenhaus does list a number of specific examples of investment holdings on which losses were realized either in the 2003 restatement or in the months thereafter along with the length of time during which those investments had been trading below their cost bases (Glickenhaus Complaint at ¶¶ 115, 116, 118). Glickenhaus additionally alleges that as of December 31, 2002, UnumProvident had more than $1 billion in unrealized losses on bond investments and provides a breakdown of the percentage of those investments which, as of

that date, had been trading below their cost bases for six months (74 percent), one year (42 percent), two years (25 percent), and three years or more (16 percent) (*id.* at ¶ 117). The Court finds these allegations sufficient to state an actionable misstatement.

## 2. <u>Scienter</u>

Defendants next argue Glickenhaus has failed to adequately plead scienter in its consolidated complaint (Court File No. 109, pp. 11-28). The term "scienter" refers to "a mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12, 96 S. Ct. 1375, 1381 n.12, 47 L. Ed. 2d 668 (1976). Under the PSLRA, securities fraud plaintiffs must "with respect to each act or omission alleged to violate [the Exchange Act], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In the Sixth Circuit, securities fraud plaintiffs satisfy the PSLRA's heightened pleading standards if they allege facts producing a strong inference of recklessness with respect to statements of present or historical fact or actual knowledge with respect to forward-looking statements. *See Helwig*, 251 F.3d at 552. However, the scienter requirement is not satisfied by allegations of negligence or mere motive and opportunity to commit fraud. *See Comshare*, 183 F.3d at 551.

As always, the requisite mental state may be established through inference, but the PSLRA limits the range of inferences to which a plaintiff is entitled at the motion to dismiss stage. Although Rule 12(b)(6) typically requires the Court to give the plaintiff the benefit of all reasonable inferences, under the PSLRA a securities fraud plaintiff is entitled only to those inferences which are both reasonable *and* strong. *Helwig*, 251 F.3d at 553. Thus, while the inference from the allegations need not be irrefutable, "plaintiffs are entitled only to the most plausible of competing

48

inferences." *Id.* Among the factors the Sixth Circuit has identified as relevant to the determination of whether a particular securities fraud plaintiff has met the scienter requirement are whether the plaintiff has alleged:

(1) insider trading at suspicious times or in unusual amounts;

(2) divergence between internal reports and external statements on a subject;

(3) proximity in time of a statement and later disclosure of inconsistent information;

(4) bribery by a top company official;

(5) quick settlement of an ancillary lawsuit charging fraud by the company;

(6) disregard of current factual information before making statements;

(7) disclosure of negative accounting information in a way that hides the negative implications;

(8) personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and

(9) self-interested motivation of defendants in saving their jobs and/or their salaries.

*Id.* at 548-52.

### a.    Alleged Claims Handling Misrepresentations

As noted previously, the Glickenhaus Complaint alleges in some detail the genesis, development, implementation, continuance, and monitoring by Defendants of an alleged scheme to "manipulate" UnumProvident's claim reserves by denying disability claims primarily according to their effect on the company's reserves rather than their individual merits (*see* Glickenhaus Complaint at ¶¶ 8, 34-66, 98-100, 102-04). In the section entitled "Additional Facts Supporting a Strong Inference of Scienter," Glickenhaus further alleges that following the 1999 merger of Unum

49

and Provident, the company was undercapitalized, in need of cash flow, and "desperate to improve its capital position," leading UnumProvident to seek to ameliorate its "cash crisis" through a variety of different securities offerings totaling approximately $2 billion (Glickenhaus Complaint at ¶¶ 73-80). Glickenhaus alleges that if UnumProvident had "properly disclosed its claims practice, properly set its reserves, and properly recognized losses in its investments during the Class Period it would never have been able to issue these debt and securities at the prices and interest rates that it did" (*id.* at ¶ 80). Thus, Glickenhaus claims Defendants' assorted misstatements and/or omissions were undertaken for the purpose of maintaining UnumProvident's standing with the various rating agencies, enabling the company to access capital markets on favorable terms, fostering consumer confidence in the company, and personally enriching themselves through both those elements of their compensation packages which were tied to performance of the company's stock (*i.e.*, stock options, bonuses, and other "awards") and their own substantial personal holdings of UnumProvident securities (*id.* at ¶¶ 80, 83-88).

Defendants contend these scienter allegations "amount to no more than speculative assertions that the Defendants had a motive and opportunity to commit securities fraud" (Court File No. 109, pp. 13-26).[17] This might be so if the Court were to look only at the generalized motive and opportunity allegations contained within the section of the Glickenhaus Complaint entitled "*Additional* Facts Supporting a Strong Inference of Scienter," but Defendants completely fail to account for the import of Glickenhaus's underlying allegations. Glickenhaus clearly and specifically

---

[17]Defendants also seek to refute any allegation of scienter by pointing to SEC filings indicating Defendants actually *increased* their stock holdings during the Class Period (Court File No. 109, pp. 17-19; Court File No. 112, Apps. U, V, X, Y, Z, AA). However, for the same reasons the Court granted Glickenhaus' motion to strike these appendices (*see supra* at § III.A), the Court will not consider this argument.

alleges a knowing and deliberate scheme to deny legitimate disability claims for the express purpose of enabling the company to convert claim reserves into income.[18] Thus, it can reasonably be inferred Defendants' failure to disclose these activities or otherwise account for the resulting liability exposure was also knowing and intentional. *See Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) (stating strong inference of scienter may arise where complaint sufficiently alleges, *inter alia*, defendants "engaged in deliberately illegal behavior"); *Enron*, 235 F. Supp. 2d at 694 ("The very pattern that is alleged undermines claims of unintentional or negligent behavior and supports allegations of intent to defraud.").

Defendants further contend an inference of fraud is unreasonable because it makes no sense for Defendants to have done what Glickenhaus alleges (*i.e.*, arbitrarily deny legitimate claims) for the purposes alleged therein (*i.e.*, growing business, attracting investors, and inflating the company's stock price) (Court File No. 109, p. 15). While it goes without saying the development and implementation of fraudulent and/or unlawful business practices is indicative of poor business

---

[18]In their reply brief, Defendants appear to contend the Glickenhaus Complaint does not actually allege a knowing and intentional scheme to deny claims but instead only alleges Defendants' policies, procedures, and objectives placed employees under "intense pressure" to "find a way" to deny claims (Court File No. 122, p. 13). The Court is unable to divine any basis for such a reading of the Glickenhaus Complaint. Whatever facts may ultimately be borne out by the evidence, the consolidated complaint quite clearly alleges a knowing, deliberate, and intentional scheme to deny meritorious claims (*see* Glickenhaus Complaint at ¶ 35 (company "embarked on a concerted effort") ¶ 38 (company "undertook a deliberate and intentional plan" and "developed and instituted various practices and procedures that had as their specific objective the denial of more claims regardless of their merit"), ¶ 46 ("sole and transparent objective of these meetings was to find a reason to terminate a claim"), ¶ 47 ("the only intent was to find some way, if possible, to terminate these claims"), ¶ 52 (Defendant Mohney "instituted his methodology for denying or terminating proper claims throughout the company"), ¶ 53 ("Provident was improperly denying claims to inflate the Company's financial results, and . . . these fraudulent practices were instituted Company-wide after the Merger")).

judgment, the mere hindsight observation that a particular course of action makes no economical sense should not preclude the filing of a securities fraud action. Otherwise, hardly any securities fraud allegation could ever survive a motion to dismiss. The common sense proposition that fraud does not constitute good business cannot be turned on its head so as to suggest any inference of fraud is unreasonable because no sane person would conduct his or her business that way. The fact remains that we, as human beings, quite regularly make irrational decisions based on reckless and/or naive assumptions that no one will notice, we will not get caught, and if we do get caught the benefits will still outweigh the costs. One need only pick up a daily newspaper or turn on a television set to see instances of individuals in important business positions who engaged in conduct that in hindsight appeared irrational. Accordingly, it is not unreasonable to infer fraudulent intent from Glickenhaus's allegations and any such inference must be considered strong in light of the detailed allegations of an intentional scheme to manipulate claim reserves and income by denying legitimate disability claims.

The Court is also puzzled by Defendants' suggestion Glickenhaus's reliance upon its allegations regarding UnumProvident's claims handling practices is somehow inconsistent with its position in response to Defendants' statute of limitations argument (Court File No. 122, p. 12). Defendants appear to suggest that if the facts and documents cited by Glickenhaus in its scienter allegations are sufficient to establish a strong inference of scienter, then they must necessarily have been sufficient to place Glickenhaus on actual or constructive notice of any alleged fraudulent activity long before the filing of the Knisley complaint. However, that particular evidence of scienter may predate the applicable limitations period in no way compels a conclusion potential plaintiffs were placed on inquiry notice due to the mere existence of such evidence. In order to

commence running of the statute of limitations the evidence must have both constituted direct or inferential proof of the fraud itself (as opposed to simply indicating intent presupposing the existence of an underlying fraud), and must have either been actually available to Glickenhaus or been discoverable in the exercise of reasonable diligence where publicly known facts warranted an investigation. *See New England*, 336 F.3d at 501. Defendants claim the evidence of the alleged fraudulent scheme was "a matter of public record," but this was only so to the extent such evidence was cited in the *United Policyholders* complaint. Glickenhaus's reliance upon some or all of those memorandums, communications, documents, and meetings in alleging scienter in no way alters the Court's previous analysis on Defendants' statute of limitations argument.

### b. Alleged Investment Misrepresentations

The general motive and incentive allegations contained within the section entitled "Additional Facts Supporting a Strong Inference of Scienter" appear to apply equally to Defendants' alleged misstatements relating to UnumProvident's investments (*see* Glickenhaus Complaint at ¶¶ 73-80, 83-88). However, unlike with its allegations of misstatements relating to the company's claims handling practices, Glickenhaus has not made any specific or detailed allegations of an underlying scheme designed to misrepresent the quality of UnumProvident's investment portfolio or conceal the company's methods of accounting for investments. Rather, Glickenhaus has done nothing more than allege certain investment disclosures were not made and certain investments were not properly accounted for, such actions were in violation of GAAP, and they had a material impact on the financial picture of the company provided to the investing public (*see id.* at ¶¶ 105-26). Consequently, Glickenhaus purports to infer scienter from allegations of motive and opportunity for fraud and a technical violation of GAAP. Neither sort of allegation, standing alone, is sufficient to

establish the requisite scienter for a securities fraud claim. *Fidel v. Farley*, 392 F.3d 220, 230 (6th Cir. 2004); *Comshare*, 183 F.3d at 551, 553.

Nonetheless, a plaintiff may still satisfy the PSLRA's pleading requirements by alleging facts which give rise to a strong inference of reckless behavior, that is "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *Id.* at 550-51. Therefore, the failure to follow GAAP combined with allegations showing the defendants knew or should have known of the errors when they were made may give rise to a strong inference of scienter. *Id.* at 553 (implying scienter can be established by alleging facts showing defendants "knew or could have known of the errors, or that their regular procedures should have alerted them to the errors sooner than they actually did"). However, Glickenhaus has alleged very little in the way of additional facts supporting an inference of scienter. In addition to the GAAP violations and Defendants' general financial incentives, Glickenhaus has done nothing more than simply identify the extent of the error ($29.1 million overstatement of income over a three-year period), allege the fact and result of the SEC's inquiry on the subject (begun in October 2002 and resolved on or about March 24, 2003), allege the fact of a restatement, and allege in a conclusive fashion Defendants "were aware of, or deliberately disregarded, the misstatements contained [in UnumProvident's financial statements] and omissions therefrom, and were aware of their materially false and misleading nature" (Glickenhaus Complaint at ¶ 22). Nowhere has Glickenhaus alleged exactly how it was Defendants were or should have been aware of the accounting errors or the insufficiency of the investment disclosures. At best Glickenhaus has alleged facts satisfying two of the nine factors identified by the Sixth Circuit in *Helwig* as relevant to a determination of whether a particular securities fraud plaintiff has met the scienter requirement: a "quick settlement of an ancillary lawsuit charging fraud by the

54

company" (*i.e.*, the SEC inquiry), and a "self-interested motivation of defendants in saving their jobs and/or their salaries." *See* 251 F.3d at 548-52. The Glickenhaus Complaint contains no allegations of insider trading by any of Defendants, divergences between internal reports on investment holdings and external statements on the subject, misleading or incomplete statements in temporal proximity to disclosures of inconsistent information, bribery by a top company official, disregard of current factual information before making statements, disclosure of negative accounting information in a way that hides the negative implications, or personal interest of certain directors in not informing disinterested directors of an impending sale of stock.

Significantly, Glickenhaus quotes a portion of UnumProvident's press release setting out the company's reasoning in not writing down particular investments sooner (*i.e.*, had been reporting other than temporary impairment losses based upon a fair value determined partly based upon market price and partly based upon the company's own analysis of the particular security) (Glickenhaus Complaint at ¶ 114), but never attempts to allege or explain why this approach was either knowingly or recklessly improper. Moreover, while Glickenhaus does allege facts and circumstances causing UnumProvident to have a particularly acute need for capital in the wake of the 1999 merger, the greater part of Glickenhaus' motive and opportunity allegations are of a general nature common to almost any publicly held corporation and its managers and executives (*i.e.*, need to maintain favorable ratings from various rating agencies, existence of compensation system tied in part to stock price, personal stock holdings, and stock options). "All corporate managers share a desire for their companies to appear successful. That desire does not comprise a motive for fraud. Neither does an executive's desire to protect his position within a company or increase his compensation." *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 690 (6th Cir. 2004) (citations

omitted); *see also Helwig*, 251 F.3d at 550-51 (noting "recklessness in securities fraud is an untidy, case-by-case concept" and "[w]e decide cases on facts, not labels"). Although motive and opportunity "can be catalysts to fraud and so serve as external markers to the required state of mind," *id.* at 550, Glickenhaus' allegations simply do not provide a sufficient foundation upon which to base a strong and reasonable inference of either intentional fraud or highly unreasonable conduct constituting an extreme departure from the standard of ordinary care. *Cf. In re Firstenergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 598 (N.D. Ohio 2004) (holding scienter sufficiently alleged where complaint alleged not only accounting error, but knowledge of both relevant information and fact they were using improper accounting practices and where overstatements were "enormous"); *D.E. & J.*, 284 F. Supp. 2d at 744 (treating GAAP violations as one of the *Helwig* factors and finding sufficient allegations to support strong inference of scienter where GAAP had been violated, defendants had renegotiated employment contracts and received substantial "retention loans" just months before company filed for bankruptcy, defendants had continued to make positive statements about the company, and one defendant had communicated to management he expected the company's stock price to drop precipitously); *In re SmarTalk Telecservices, Inc. Sec. Litig.*, 124 F. Supp. 2d 505, 515 (S.D. Ohio 2000) ("GAAP . . . violations are relevant to show an auditor's scienter when the complaint also identifies specific, highly suspicious facts and circumstances available to the auditor at the time of the audit and alleges that these facts were ignored, either deliberately or recklessly."). Glickenhaus' allegations as to the nature and extent of the GAAP violations are sufficient to create an inference of negligence and perhaps even a reasonable inference of intentional fraud, but neither is sufficient to state a claim under the PSLRA. Glickenhaus is entitled to only "the most plausible of competing inferences," *Helwig*, 251 F.3d at 553, and the

theoretical possibility of knowledge and/or willful disregard is insufficient to make recklessness the *most* plausible explanation for GAAP violations. *See SmarTalk Telecservices*, 124 F. Supp. 2d at 516-17 (finding specific, highly suspicious facts and circumstances are necessary in order to support a strong and reasonable inference of highly unreasonable conduct constituting an extreme departure from the standard of ordinary care). Accordingly, the Court concludes it must dismiss Glickenhaus' claims under § 10(b) and Rule 10b-5 to the extent they are premised upon the alleged investment misrepresentations.

### 3. <u>Causation</u>

Finally, Defendants argue Glickenhaus has not sufficiently alleged causation (Court File No. 109, pp. 39-42). The PSLRA provides as follows:

> In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.

15 U.S.C. § 78u-4(b)(4). A securities fraud plaintiff may not satisfy this burden simply by alleging and proving he purchased the security at an inflated price. *Dura Pharms., Inc. v. Broudo*, --- U.S. ----, 125 S. Ct. 1627, 1631-34, 161 L. Ed. 2d 577 (2005); *D.E. & J Ltd. P'ship v. Conaway*, Nos. 03-2334 & 03-2417, 2005 WL 1386448, at *4 (6th Cir. Jun. 10, 2005) (unpublished opinion). Instead, a plaintiff must "adequately allege and prove the traditional elements of causation and loss." *Dura*, 125 S. Ct. at 1633. This requires a plaintiff to allege both (1) transaction causation (*i.e.*, that but for the defendant's fraudulent statement or omission, the plaintiff would not have entered into the transaction for the purchase or sale of a security, and (2) loss causation (*i.e.*, that the subject of the

57

fraudulent statement relied upon was the cause of the actual loss suffered).  *Suez Equity Investors, LP v. Toronto-Dominion Bank*, 250 F.3d 87, 95-96 (2d Cir. 2001); *Robbins v. Koger Props., Inc.* 116 F.3d 1441, 1447 (11th Cir. 1997); *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648-49 (7th Cir. 1997).

Defendants contend that although the Glickenhaus Complaint references UnumProvident's stock price at various times during the Class Period, nowhere does it demonstrate "any causal link between a concrete decline in [the company's] stock price and any particular misstatement or omission . . . or the disclosure of some alleged fraud" (Court File No. 109, p. 41).  As such, it would appear Defendants' argument focuses on Glickenhaus' allegations (or lack of allegations) with respect to loss causation and does not take issue with Glickenhaus' pleading of transaction causation.  To prove loss causation, a plaintiff must show "that the untruth was in some reasonably direct, or proximate, way responsible for his loss."  *Robbins*, 116 F.3d at 1447.  A plaintiff need not allege the defendant's misrepresentations were the sole cause of the plaintiff's loss, only that they were a substantial contributing cause.  *Miller v. Asensio & Co., Inc.*, 364 F.3d 223, 232 (4th Cir. 2004); *Semerenko v. Cendant Corp.*, 223 F.3d 165, 186-87 (3d Cir. 2000); *Caremark*, 113 F.3d at 649.

### a.    Alleged Claims Handling Misrepresentations

The Glickenhaus Complaint generally alleges Defendants' actions "caus[ed] the Company's shares and other securities to trade at artificially inflated levels" (Glickenhaus Complaint at ¶ 10) and "in reliance on the integrity of the market, [Glickenhaus and the putative class members] paid artificially inflated prices for UnumProvident publicly traded securities" (*id.* at ¶ 238), thus rendering Glickenhaus' losses the "direct and proximate result of . . . [Defendants'] wrongful

58

conduct" (*id.* at ¶ 239). Standing alone, such general conclusive allegations would be insufficient to survive a motion to dismiss. *Dura*, 125 S. Ct. at 1631-34 (reversing denial of motion to dismiss where plaintiffs alleged only that they had purchased securities at artificially inflated prices in reliance on the integrity of the market); *D.E. & J.*, 2005 WL 1386448, at *5-6 (affirming dismissal of complaint where plaintiffs alleged they had paid artificially inflated prices, defendants' wrongful conduct was the direct and proximate cause of their loss, and price of stock had plummeted following filing of bankruptcy petition).

However, Glickenhaus maintains it has adequately alleged loss causation by pointing to significant stock price declines following revelations of negative information about the company (Court File No. 117, pp. 33-36). One method of pleading loss causation is to allege facts indicating the plaintiff's economic loss was suffered in close temporal proximity to the public disclosure of the alleged fraud. Where a significant stock price decline immediately follows an announcement revealing fraud or prior misinformation to the public, it can reasonably be inferred that decline is fairly attributable to the conduct or information disclosed. *See D.E. & J*, 284 F. Supp. 2d at 748-49. In its consolidated complaint, Glickenhaus alleges UnumProvident's stock was trading at approximately $15 on March 29, 2000, just before the commencement of the Class Period (Glickenhaus Complaint at ¶ 132), and it began to rise steadily thereafter based upon consistently positive statements by Defendants (*id.* at ¶¶ 134, 136) reaching a Class Period high of $32.27 on May 16, 2001, in the wake of the release of the company's 2000 annual report and its results for the first quarter of 2001 (*id.* at ¶¶ 10, 173). Glickenhaus then alleges the stock price fell 9.44 percent on October 2, 2002, after UnumProvident issued a press release announcing its anticipation of impending negative media reports concerning its claims handling practices (*id.* at ¶ 213) and

dropped an additional 27 percent following the company's April 25, 2003 announcement it was increasing its claim reserves by $454 million (*id.* at ¶ 228).

Glickenhaus does not, however, provide any detail about movements in UnumProvident's stock price following other significant events alleged in its consolidated complaint, such as the actual airing of the media reports regarding the company's claims handling practices, the opening of any regulatory investigations into those practices, or the filing of any lawsuits against the company based upon these other significant events (including the benefits denial class actions which comprise a portion of the instant MDL proceeding), or jury awards or settlements resulting from any such investigations or litigation. Consequently, Glickenhaus' causation allegations provide something less than a complete picture. Nonetheless, Glickenhaus has at least pointed to two sizeable dips in UnumProvident's stock price following disclosures of information which in some marginal way tended to disclose the existence of the alleged underlying fraudulent scheme. It is on this basis the Court can distinguish the instant allegations from those found insufficient by the Sixth Circuit in *D.E. & J.* There, the plaintiffs had only alleged a stock price dip following the defendant-company's filing for reorganization under Chapter 11, an action which plaintiffs had not even alleged disclosed any prior misrepresentations or anything except that the company was doing poorly. *See* 2005 WL 1386448, at *6 (noting plaintiffs had ignored later drops following announcement of restatement of financial records). Here, the two announcements or disclosures cited by Glickenhaus reveal at least some minimal details suggesting the possibility of prior misrepresentations, thus justifying an inference the negative effect on UnumProvident's share price reflected the market's reaction to this acknowledgment. Glickenhaus' allegations are by no means compelling, however, unlike the elements of pleading an actionable misstatement and scienter, the

60

PSLRA imposes no heightened pleading standard with respect to causation. Thus, a plaintiff must only meet the traditional pleading requirements of Federal Rule of Civil Procedure 8(a)(2) ("short and plain statement of the claim showing that the pleader is entitled to relief") and provide "some indication of the loss and causal connection the plaintiff has in mind" so as to place the defendants on "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Dura*, 125 S. Ct. at 1634. Despite its failure to allege market reaction to more significant moments in the revelation of Defendants' alleged fraud, Glickenhaus has met its minimal burden of notice in this case, though just barely.

### b. Alleged Investment Misrepresentations

Although the Court need not rule on the sufficiency of Glickenhaus' causation allegations with respect to the alleged misrepresentations relating to UnumProvident's investment policies and portfolio, the Court notes it would find those allegations sufficient. In fact, Glickenhaus' causation allegations are actually a bit stronger with respect to this side of the case. Glickenhaus has alleged UnumProvident's stock price fell 37 percent in the two days following the February 2003 announcement of the SEC's investigation into the company's investment disclosures and accounting for other-than-temporary losses on below-investment-grade securities (Glickenhaus Complaint at ¶ 223) and fell 36.55 percent and 25.37 percent on consecutive days in March 2003 following indications from Moody's Investor's Service it would likely downgrade the company's debt rating to "junk" level based upon concerns about the company's accounting for investments (*id.* at ¶¶ 10, 72, 224, 226). Notably absent from Glickenhaus's allegations are any reference to the reaction of the market to UnumProvident's March 24, 2003 announcement it had resolved the SEC inquiry by restating its financial results from 2000, 2001, and 2002 to reflect investment losses of $29.1 million

or the filing of the company's 2002 Form 10-K on March 31, 2003, which was to make all of the adjustments and disclosures requested by the SEC. According to the consolidated complaint, these two disclosures revealed for the first time the true extent of the unrealized losses being carried by the company (*id.* at ¶¶ 114-18, 125-26), yet for some reason Glickenhaus has deemed it unnecessary to describe the market's reaction to these critical disclosures. Nonetheless, for the reasons stated above in § III.C.3.a., assuming Glickenhaus had adequately alleged scienter with respect to the alleged investment misrepresentations, the Court would have found the causation allegations sufficient.

**D.     Conclusion**

Because Glickenhaus has failed to adequately plead scienter with respect to the alleged investment misrepresentations, the Court will **GRANT IN PART** Defendants' motions to dismiss the Glickenhaus Complaint (Court File No. 107, 108) to the extent Glickenhaus' securities fraud claims are based upon any alleged misrepresentations relating to UnumProvident's investment disclosures, policies, or accounting practices. However, the Court finds Glickenhaus has adequately alleged a securities fraud claim based upon alleged misrepresentations regarding UnumProvident's claims handling practices and, therefore, will **DENY IN PART** Defendants' motions to dismiss (Court File Nos. 107, 108) with respect to that aspect of the litigation.

In a footnote on the final page of Glickenhaus' brief in opposition to Defendants' motions, Glickenhaus requests leave to amend its complaint "[i]n the unlikely event this Court grants the Motions in whole or in part" (Court File No. 117, p. 44 n. 27). This request does not comply with the Court's local rules, which requires a party seeking to amend a pleading to attach an original and one copy of the proposed amendment. *See* E.D. Tenn. LR 15.1. Moreover, Glickenhaus has already

had the opportunity to file a consolidated amended complaint in light of the previous complaints filed in each of the independent cases comprising this consolidated action. Although the general rule is that leave to amend is freely given in the interests of justice, because the PSLRA's heightened pleading standards reflect a legislative goal to eliminate securities fraud suits lacking a factual basis at the pleading stage courts have limited the availability of amendments in securities fraud actions. *PR Diamonds*, 364 F.3d at 699-700; *Miller v. Champion Enter. Inc.*, 346 F.3d 660, 691-92 (6th Cir. 2003). Thus, even assuming Glickenhaus' footnote request could be treated as a motion to amend its complaint, Glickenhaus would not be entitled to an advisory opinion from the Court pointing out the deficiencies in the complaint and allowing them a free opportunity to cure them. *Begala v. PNC Bank, Ohio, Nat'l Ass'n*, 214 F.3d 776, 784 (6th Cir. 2000). Accordingly, the Court will **DENY** Glickenhaus' request for leave to amend.[19]


## V.  THE *AZZOLINI* AND *BERNSTEIN* ACTIONS (1:03-CV-1003 & 1:03-CV-1005)

As stated earlier also pending before the Court in the consolidated *Azzolini v. CorTS Trust II for Provident Financial Trust I, et al.*, and the *Bernstein v. CorTS Trust for Provident Financing Trust I, et al.*, putative securities fraud class actions are "The UnumProvident Defendants' Motion to Dismiss the Consolidated Amended Complaints" (*Azzolini* Court File No. 13; *Bernstein* Court File No. 23) and the "Motion of Defendant J. Harold Chandler to Dismiss the Consolidated

---

[19] By this statement the Court is not intending to forbid Glickenhaus from making any future motions to amend. The Court is only stating that it will not approve of any such motion whose sole purpose is to avoid or circumvent this decision. If a motion to amend has some other purpose, then the Court would address that motion when and if made.

Amended Complaints" (*Azzolini* Court File No. 14; *Bernstein* Court File No. 25).[20]  Both motions

are brought pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).  In ruling on these

motions, the Court has considered the supporting memorandum filed by Defendants[21] (*Azzolini*

Court File No. 14; *Bernstein* Court File No. 24) (hereinafter, "UnumProvident Memo"), the

memorandum in opposition filed jointly by Plaintiffs[22] (*Azzolini* Court File No. 33; *Bernstein* Court

File No. 44) (hereinafter, "Plaintiffs' Response"), and the reply briefs filed by Defendants (*Azzolini*

Court File No. 35; *Bernstein* Court File No. 46) (hereinafter, "UnumProvident Reply") and

Defendant Chandler (*Azzolini* Court File No. 36; *Bernstein* Court File No. 47) (hereinafter,

"Chandler Reply").  Additionally, Defendants have filed a notice of recent developments and/or

supplemental authority (*Azzolini* Court File Nos. 40, 41; *Bernstein* Court File Nos.51, 52) to which

Plaintiffs have responded (*Azzolini* Court File No. 42; *Bernstein* Court File No. 53).  For the

following reasons, the Court will **GRANT** both motions to dismiss.

Defendants contend the *Azzolini* and *Bernstein* complaints should be dismissed because:  (1)

Plaintiffs' claims are barred by the statute of limitations to the extent they are predicated upon an

alleged company "policy" of denying disability claims which led to a misstatement of

UnumProvident's financial condition; (2) Plaintiffs have failed to allege specific facts demonstrating

---

[20]Again, Chandler has filed a separate motion by relies upon the UnumProvident Defendants'
motion in all respects so the Court will not discuss his motion separately.

[21]The Court will continue to use the general shorthand "Defendants," but wishes to again
clarify it only intends to refer to those defendants involved in the instant motions (*i.e.*,
UnumProvident and those individuals currently or formerly affiliated with that company).  The
Court does not intend to encompass the SSB Defendants through the use of this nomenclature.

[22]Since the *Azzolini* and *Bernstein* plaintiffs have joined with each other in all filings related
to the instant motions to dismiss, the Court will refer to them collectively as "Plaintiffs" within §
IV of the instant Memorandum.

64

a strong inference of fraudulent intent as required by the heightened pleading standards of the PSLRA; (3) Plaintiffs have failed to adequately plead the existence of any actionable material misstatement or omission as required by the PSLRA and Federal Rule of Civil Procedure 9(b); and (4) Plaintiffs have failed to adequately allege causation (*see generally* UnumProvident Memo at 1-3). Defendants have incorporated the entirety of the arguments advanced in support of their motion to dismiss the Glickenhaus Complaint (Case No. 1:03-CV-49, Court File No. 109) and have offered additional arguments relating to Plaintiffs' scienter and causation allegations. For the reasons previously stated in § III.B of this Memorandum, the Court rejects the Defendants' statute of limitations argument, and having reviewed the *Azzolini* and *Bernstein* complaints and found them both to be at least as detailed as the Glickenhaus Complaint, the Court finds Plaintiffs have sufficiently alleged an actionable misstatement for the same reasons articulated in § III.C.1. The Court will, however, give independent consideration to Plaintiffs' scienter and causation allegations.

## A.     Scienter

In addition to the arguments advanced with respect to the Glickenhaus Complaint, Defendants point to what they contend is a fact of critical importance with respect to the *Azzolini* and *Bernstein* complaints, that is Plaintiffs, unlike Glickenhaus, never actually purchased any UnumProvident securities. Indeed, neither Azzolini nor Bernstein has alleged they ever purchased or owned any securities issued by or reflecting obligations of UnumProvident. The CorTS certificates they did purchase were issued by an unaffiliated entity (*i.e.*, Defendant SPC) through trusts created for that specific purpose (*Azzolini* Complaint at ¶¶ 30, 32; *Bernstein* Complaint at ¶¶ 40-41). The sole assets of these trusts were securities issued in 1998 by a UnumProvident affiliate (Provident Financing Trust I), whose sole assets were in turn debentures issued directly by

65

UnumProvident (*Azzolini* Complaint at ¶ 32; *Bernstein* Complaint at ¶¶ 41). Because UnumProvident did not issue the CorTS certificates and the company's obligations under the UnumProvident securities which secured the CorTS certificates are dictated by contract and remain unchanged, Defendants contend they "have no pecuniary interest in the market value or marketability of [the CorTS certificates] or any conceivable motive to defraud holders of those certificates" nor is there any allegation "the market price of the CorTS Certificates bears any relationship whatsoever to the price of UnumProvident's equity securities" (UnumProvident Memo at 5-6). In short, Defendants contend that even assuming they had some motive and/or intent to artificially inflate UnumProvident's stock price, they had no motive whatsoever to defraud purchasers of the CorTS certificates issued by SPC.[23]

To be sure, the scope of § 10(b) and Rule 10b-5 clearly encompasses misstatements and omissions made by persons who are not affiliated with the issuer of the particular security purchased by the plaintiff. *See* 15 U.S.C. § 78j ("[i]t shall be unlawful for *any person* . . .") (emphasis added). Further, the Court is unable to locate any authority suggesting a securities fraud plaintiff must

_____

[23]Plaintiffs devote several pages of their brief in opposition to arguing their complaints adequately plead Defendants' alleged misrepresentations were made "in connection with" the purchase or sale of the CorTS certificates, as required for liability under § 10(b) and Rule 10b-5 (Plaintiffs' Response at 16-19). However, Defendants do not appear to raise this issue in their motions to dismiss. Rather, they claim the lack of any direct connection between them and the issuance and sale of the CorTS certificates weighs against Plaintiffs' allegations of scienter. Defendants do, however, assert a roughly analogous standing argument in their reply brief (*see* UnumProvident Reply at 12-14). Although the Court notes this standing argument may ultimately be dispositive of Plaintiffs' claims against the UnumProvident Defendants, *see Ontario Public Serv. Employees Union Pension Trust Fund v. Nortel Networks Corp.*, 369 F.3d 27, 32-34 (2d Cir. 2004) (holding stockholders do not have standing to sue under § 10(b) and Rule 10b-5 where entity whose stock they purchased is negatively impacted by material misstatements of another company), the Court will decline to address this issue since the argument was raised for the first time in a reply brief and Plaintiffs were not given a meaningful opportunity to respond.

necessarily offer specific motive allegations in order to adequately allege scienter. *See Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 345 (4th Cir. 2003) ("courts should not restrict their scienter inquiry by focusing on specific categories of facts, such as those relating to motive and opportunity, but instead should examine all of the allegations in each case to determine whether they collectively establish a strong inference of scienter"); *Helwig*, 251 F.3d at 550-51 ("In this wash of allegations, 'motive' and 'opportunity' are simply recurring patterns of evidence. We decide cases on facts, not labels."). However, the particular facts which tend to show motive and opportunity in a given case, or a lack of such particular facts, are certainly relevant to determining whether the complaint demonstrates a strong inference of scienter. *Id.* As such, the absence of any obvious pecuniary, personal, or business motivation on the part of Defendants in attempting to defraud investors in CorTS certificates issued by the SSB Defendants makes any inference of scienter marginally weaker. Nonetheless, the absence of a particularized motive for defrauding Plaintiffs is not so strong a factor as to diminish the force of the allegations of a deliberate scheme to deny legitimate claims, understate claim reserves, and overstate income. Accordingly and for the same reasons set forth in § III.B.2.a, the Court finds Plaintiffs have adequately alleged facts supporting a strong inference of scienter with respect to the alleged claims handling misrepresentations. By the same token though, the general lack of particularized motive only serves to weaken Plaintiffs' scienter allegations with respect to the alleged investment misrepresentations. Moreover, the allegations regarding UnumProvident's accounting for investments in the *Azzolini* and *Bernstein* complaints provide considerably less detail than those in the Glickenhaus Complaint. Therefore, the Court finds the reasoning set forth in § III.B.2.b even stronger within the context of the *Azzolini* and *Bernstein* complaints and concludes Plaintiffs have failed to adequately plead scienter with

respect to Defendants' alleged investment misrepresentations.

**B.      Causation**

With respect to causation, Defendants again incorporate the arguments advanced previously in connection with their motion to dismiss the Glickenhaus Complaint, but additionally argue Plaintiffs have failed to allege transaction causation (UnumProvident Response at 6-11).  As stated previously by the Court, a securities fraud plaintiff must adequately allege facts demonstrating both (1) that but for the defendant's fraudulent statement or omission, the plaintiff would not have entered into the transaction for the purchase or sale of a security (*i.e.*, transaction causation), and (2) that the subject of the fraudulent statement relied upon was the cause of the actual loss suffered (*i.e.*, loss causation).   Defendants' transaction causation argument challenges Plaintiffs' ability to take advantage of the presumption of detrimental reliance afforded by the "fraud on the market" theory of liability, but the Court ultimately need not take up this argument since Plaintiffs' allegations of loss causation suffer inadequacies greater than those in the Glickenhaus Complaint.

Plaintiffs repeatedly allege Defendants' material misstatements and omissions caused them to purchase the CorTS certificates at artificially inflated prices[24] (*see Azzolini* Complaint at ¶¶ 10, 17, 206, 207, 212, 213, 214; *Bernstein* Complaint at ¶¶ 10, 20, 206, 207, 212, 213).  However, the Supreme Court recently held such allegations standing alone do not satisfy a securities fraud plaintiff's burden of pleading causation.   *Dura*, 125 S. Ct. at 1631-34.  Beyond their general allegations of having purchased the CorTS certificates at an inflated price, Plaintiffs, like Glickenhaus, have also pointed to market reactions to certain events (*Azzolini* Complaint at ¶¶ 128-

---

[24]As an aside, this allegation is in itself a bit suspect in that all of the allegedly material misstatements identified in the *Azzolini* and *Bernstein* complaints occurred *after* Plaintiffs allege they purchased their CorTS certificates.

29, 133; *Bernstein* Complaint at ¶ 132-33, 136).  However, none of those events involved revelations or disclosures of UnumProvident's allegedly unlawful and/or fraudulent claims handling practices.  Consequently, the *Azzolini* and *Bernstein* Complaints are completely devoid of any specific allegation of causation with respect to that class of alleged misrepresentations.  Nowhere do Plaintiffs allege any negative market reaction relating either to the CorTS certificates or UnumProvident's own securities in the wake of events which revealed UnumProvident's allegedly unlawful claims handling practices and corresponding scheme to understate claim reserves and overstate income.  Moreover, Plaintiffs do not even so much as present an explicit conclusive allegation the price of UnumProvident's securities or the CorTS certificates dropped significantly once the truth became known.  Accordingly, at least with respect to the alleged claims handling misrepresentations, Plaintiffs' causation allegations are even more lacking than those the Court previously found barely adequate in the Glickenhaus Complaint.  Glickenhaus at least described market reactions to two events bearing a tangential relation to the alleged claims handling misrepresentations (*i.e.*, the October 2, 2002 UnumProvident press release announcing anticipated negative media reports regarding claims handling practices and the company's April 25, 2003 announcement it was increasing claim reserves by $454 million).  Accordingly, the Court finds Plaintiffs' loss causation allegations insufficient to survive a motion to dismiss with respect to their claims against Defendants premised upon alleged claims handling misrepresentations. *See Dura*, 125 S. Ct. at 1631-34; *D.E. & J.*, 2005 WL 1386448, at *4-6.

Plaintiffs do, however, present the following allegations regarding market reaction to revelations and/or disclosures of UnumProvident's allegedly inappropriate accounting for its investments:  (1) UnumProvident's stock price dropped 37 percent in the two days following the

company's February 5, 2003 announcement it would be taking an additional $93 million in write-downs on its impaired assets for the fourth quarter of 2002 and that the SEC had inquired about the timing and amount of the company's recording of other-than-temporary losses on its junk bond investments (*Azzolini* Complaint at ¶ 128; *Bernstein* Complaint at ¶ 132)[25]; (2) the CorTS Trust II price fell from $22.81 to $17.20 in the days following the February 5 announcement and the ensuing placement of UnumProvident's credit rating on review for possible downgrade by Standard & Poor's (*Azzolini* Complaint at ¶ 128)[26]; (3) UnumProvident's stock dropped by more than 50 percent over a two-day period following Moody's March 7, 2003 indication it would likely downgrade the company's debt rating to "junk" level and UnumProvident's March 10, 2003 statement addressing the concerns expressed by Moody's and the SEC (*Azzolini* Complaint at ¶¶ 129-33; *Bernstein* Complaint at ¶ 133-36); and (4) "the CorTS price plummeted to an all-time low of $13.69" on March 11, 2003 following the same events (*Azzolini* Complaint at ¶¶ 129-33; *Bernstein* Complaint at ¶ 133-36). These four allegations refer to the same two general events or revelations cited in the Glickenhaus Complaint and fail to present any allegation with respect to the market's reaction to UnumProvident's March 24, 2003 announcement it had resolved the SEC inquiry by restating its financial results from 2000, 2001, and 2002 to reflect investment losses of $29.1 million or the filing of the company's 2002 Form 10-K on March 31, 2003, which was to make all of the adjustments

_____

[25]The Court notes the *Bernstein* Complaint appears to contain a mistake in this regard, citing the 37 percent drop as occurring on March 10, 2003, rather than in the days immediately following UnumProvident's February 5, 2003 announcement (*see Bernstein* Complaint at ¶ 132). In light of its ultimate conclusion the complaint should be dismissed the Court will give Bernstein the benefit of the doubt and assume this is a mere typographical mistake. However, this error does not advance her cause.

[26]Bernstein does not present a similar allegation with respect to the CorTS I certificates in her complaint.

and disclosures requested by the SEC. However, even assuming these allegations are sufficient to allege causation, the Court must still dismiss Plaintiffs' claims relating to the alleged investment misrepresentations for failure to adequately plead scienter.

## C.      Conclusion

Because Plaintiffs have failed to adequately allege scienter with respect to their securities fraud claims against the UnumProvident Defendants based upon alleged investment misrepresentations and because Plaintiffs have failed to adequately allege causation with respect to any such claims premised upon alleged claims handling misrepresentations, the Court will **GRANT** Defendants' motions to dismiss in their entirety (*Azzolini* Court File Nos. 13, 14; *Bernstein* Court File Nos. 23, 25).

## VI.      <u>CONCLUSION</u>

For the reasons stated in this memorandum, the Court will **DENY** Defendants' motion requesting oral argument (Case No. 1:03-CV-49, Court File No. 131), **GRANT IN PART** and **DENY IN PART** Glickenhaus' motion to strike (Case No. 1:03-CV-49, Court File No. 115), **GRANT** Glickenhaus' motion for judicial notice (Case No. 1:03-CV-49, Court File No. 118), **GRANT IN PART** and **DENY IN PART** Defendants' motions to dismiss the Glickenhaus Complaint (Case No. 1:03-CV-49, Court File Nos. 107, 108), **DENY** Glickenhaus' request to amend its pleadings (Case No. 1:03-CV-49, Court File No. 117, p. 44 n. 27), and **GRANT** Defendants' motions to dismiss the *Azzolini* and *Bernstein* Complaints (Case No. 1:03-CV-1003, Court File Nos. 13, 14; Case No. 1:03-CV-1005, Court File Nos. 23, 25).

An Order shall enter.

_____ **/s/**
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**